*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0336p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            *v.*

Nos. 12-5226/5582

CORNELIUS DEMORRIS BLEWETT (12-5226)
and JARREOUS JAMONE BLEWITT (12-5582),
            *Defendants-Appellants.*

———————————————

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:04-cr-36-2—Joseph H. McKinley, Jr., Chief District Judge.

Argued: October 9, 2013

Decided and Filed: December 3, 2013

Before: BATCHELDER, Chief Judge; MERRITT, BOGGS, MOORE, COLE,
CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE,
GRIFFIN, KETHLEDGE, WHITE, STRANCH and DONALD, Circuit Judges.

———————————————

## COUNSEL

**ARGUED:** Frank W. Heft, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Louisville, Kentucky, for Appellants. Terry M. Cushing, UNITED STATES
ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee. Vincent M. Southerland,
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., New York, New
York, for Amicus Curiae. **ON BRIEF:** Frank W. Heft, Jr., Scott T. Wendelsdorf, Laura
R. Wyrosdick, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Louisville,
Kentucky, for Appellants. Terry M. Cushing, UNITED STATES ATTORNEY'S
OFFICE, Louisville, Kentucky, David M. Lieberman, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Vincent M.
Southerland, Ria Tabacco Mar, NAACP LEGAL DEFENSE AND EDUCATIONAL
FUND, INC., New York, New York, Candace C. Crouse, PINALES STACHLER
YOUNG BURRELL & CROUSE CO., L.P.A., Cincinnati, Ohio, Douglas A. Berman,
THE OHIO STATE UNIVERSITY MORITZ COLLEGE OF LAW, Columbus, Ohio,
Dennis G. Terez, Jeffrey B. Lazarus, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Cleveland, Ohio, for Amici Curiae.

SUTTON, J., delivered the opinion of the court, in which BATCHELDER, C. J., BOGGS, GILMAN, GIBBONS, COOK, McKEAGUE, GRIFFIN and KETHLEDGE, JJ., joined, and MOORE, J., joined in the result.  MOORE, J. (pp. 21–33), delivered a separate opinion concurring in the judgment.  MERRITT, J. (pp. 34–37), delivered a separate dissenting opinion, in which DONALD J., joined.  COLE, J. (pp. 38–43), delivered a separate dissenting opinion.  CLAY, J. (pp. 44–58), delivered a separate dissenting opinion, in which DONALD, J., joined.  ROGERS, J. (pp. 59–67), delivered a separate dissenting opinion, in which WHITE and STRANCH, JJ., joined, MERRITT, J., joined in part, and COLE, J., joined except for the last paragraph.  WHITE, J. (pp. 68–79), delivered a separate dissenting opinion.

———————————————

**OPINION**

———————————————

SUTTON, Circuit Judge.   The Anti-Drug Abuse Act of 1986 established mandatory minimum sentences for possessing crack cocaine with the intent to distribute it:  5 years for possessing 5 grams, 10 years for possessing 50 grams.  100 Stat. 3207.  The Fair Sentencing Act of 2010 increased the amount of crack cocaine needed to activate the same mandatory minimums.  It now takes 28 grams to trigger the 5-year penalty and 280 grams to trigger the 10-year penalty.  124 Stat. 2372.  Through these changes, the Fair Sentencing Act significantly reduced, but did not eliminate, a sentencing disparity between offenses involving crack and powder cocaine.  What used to be a 100:1 ratio between the amount of powder and crack needed to trigger the mandatory minimums has become an 18:1 ratio.

At issue in this case is whether the changes created by the Act apply to defendants sentenced five years before the new law took effect.  Consistent with a 142-year-old congressional presumption against applying reductions in criminal penalties to those already sentenced, 1 U.S.C. § 109, consistent with the views of all nine Justices and all of the litigants in *Dorsey v. United States*, 132 S. Ct. 2321, 2332 (2012), consistent with the decisions of every other court of appeals in the country, and consistent with dozens of our own decisions, we hold that the Act does not retroactively undo final sentences.

I.

In 2005, a federal court convicted cousins Cornelius Blewett and Jarreous Blewitt (the Blewetts) of possessing crack cocaine with the intent to distribute it.  Neither side contests that Cornelius had 19.65 grams and Jarreous 26.92 grams.  Under the Anti-Drug Abuse Act, those amounts normally would have produced a 5-year minimum sentence.  But because the Blewetts each had a prior felony drug conviction, the Act doubled the minimum.  *See* 21 U.S.C. §§ 841(b), 851.  The court sentenced each cousin to 10 years, the lowest sentence possible under the law.

After Congress enacted the Fair Sentencing Act, the Blewetts moved for a sentence reduction.  *See* 18 U.S.C. § 3582(c)(2).  The Blewetts' 19.65 and 26.92 grams of crack cocaine fall short of the 28 grams required for the Fair Sentencing Act's new mandatory minimums to kick in.  As a result, the Blewetts claimed that, even though they were sentenced before the Fair Sentencing Act took effect, they should benefit from Congress's reduction of the statutory penalties.  The district court denied their request.

The Blewetts appealed.  While the appeal was pending, Jarreous's prison sentence (though not his term of supervised release) ended, prompting the government to ask us to dismiss his appeal as moot.  Because we no doubt have jurisdiction over one of the defendants in this consolidated appeal, we need not resolve the motion and may proceed to answer the merits question presented by this appeal. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998); *Norton v. Mathews*, 427 U.S. 524, 531 (1976).

II.

In our view:  (1) the Fair Sentencing Act's new mandatory minimums do not apply to defendants sentenced before it took effect; (2) § 3582(c)(2) does not provide a vehicle for circumventing that interpretation; and (3) the Constitution does not provide a basis for blocking it.

A.

*The Fair Sentencing Act*.  Under the general saving statute, enacted in 1871, a law that reduces statutory penalties for an offense presumptively does not alter penalties incurred before the new law took effect.  1 U.S.C. § 109.  A statute may overcome this default rule but only expressly or by clear implication.  *Dorsey*, 132 S. Ct. at 2332.  The Fair Sentencing Act nowhere provides that it covers offenders sentenced before it became effective.  Nor do the Act's clear implications show a desire to apply the new law to offenders already sentenced.  To the contrary, no feature of the Act is backward looking and many are forward looking.  Congress, to be sure, disapproved of the old mandatory minimums; that is why it changed them.  But if rejection of the old penalty were all it took to make a new penalty retroactive to all individuals previously sentenced, *every* new penalty would be fully retroactive, shearing the general saving statute of meaning.

*Dorsey* reinforces this conclusion.  Its core holding is that the Fair Sentencing Act applies to all individuals sentenced *after* its effective date, which of course defeats the Blewetts' claim.  The Blewetts were sentenced in 2005, five years before the Act became law.

*Dorsey*'s reasoning points in the same direction.  The Court identified six factors that supported this cut-off date, one that made the Act applicable to individuals who had distributed crack cocaine before its effective date but who were sentenced after it.  While all six factors favored the *Dorsey* outcome, the same is not remotely true here.

*Factor one*.  *Dorsey* began by explaining that Congress may overcome the § 109 default rule by a clear statement or clear implication.  *Id.* at 2331.  This factor helped Dorsey:  He could point to *language in the Fair Sentencing Act* suggesting that Congress wanted the new ratios to apply to future sentences.  *See id.* at 2332–33 (discussing § 8 of the Act).  But it hurts the Blewetts:  They cannot find, indeed they do not even try to find, any similar textual foothold to support their claim that Congress wanted the new ratios to alter final sentences.

*Factor two*.  Under the sentencing guidelines system created by the Sentencing Reform Act of 1986, *Dorsey* pointed out, a defendant's sentence normally depends on the rules "in effect on the date the defendant is sentenced." *Id.* at 2332.  This rule helped Dorsey:  When he was first sentenced, the new minimums were in effect.  But this rule hurts the Blewetts: When they were sentenced, the old minimums were in effect.

*Factor three*.  *Dorsey* explained that the "language in the Fair Sentencing Act implies that Congress intended to follow the Sentencing Reform Act background principle here." *Id.*  In other words, *Dorsey* concluded that *both* the Fair Sentencing Act and the Sentencing Reform Act counsel in favor of applying the relevant sentencing law *on the date of initial sentencing*.  This factor favored Dorsey (who was sentenced after the Act's effective date) but hurts the Blewetts (who were sentenced five years before the Act's effective date).

*Factor four*.  If the new mandatory minimums did not apply to everyone sentenced after the Act's passage, *Dorsey* cautioned, two offenders who committed the same crime—one say a week before the Act became law, one a week after—could receive "disparate sentences" despite "roughly contemporaneous sentencing, *i.e.*, the same time, the same place, and even the same judge." *Id.* at 2333.  While this date-of-the-crime consideration favored Dorsey, it means nothing here.  Under our holding and the holdings of all courts in the country, everyone sentenced at the same time is treated the same way:  The new minimums apply to everybody sentenced after the Act, and the old minimums apply to everybody sentenced before it.  In this instance, disparities will arise only if our court picks a different cut-off date and begins applying the new law to old sentences.

*Factor five*.  Congress *required* the Sentencing Commission to apply the new guidelines (reflecting the new ratios) to all future sentences. *Id.* at 2332–33.  *Dorsey* thus reasoned that Congress would not have simultaneously insisted on using new guidelines for *all* future sentences but on using new statutory minimums for *some* future sentences. *Id.* at 2334.  This factor helped Dorsey but it cuts the other way here.

Congress, all agree, did not require the Commission to apply the new guidelines to *past* sentences.

*Factor six*. *Dorsey* found no "strong countervailing consideration" to using the date of sentencing for determining when the Act applied. *Id.* at 2335. While that factor helped Dorsey, it hurts the Blewetts. This case involves a "countervailing consideration" of the weightiest sort: the government's interest in the finality of its sentences. Not only is that principle codified in the § 109 saving statute, but "the principle of finality . . . is essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion); *see Johnson v. United States*, 544 U.S. 295, 309 (2005).

*Dorsey* carefully marshaled *all six* factors before holding that, despite the § 109 presumption, the Fair Sentencing Act applied to defendants who offended before but were sentenced after the Act's passage. And even with all six factors pointing one way, *Dorsey* remained a close case: The Court divided 5–4, and the five agreed that the issue was "difficult." 132 S. Ct. at 2330. Where Dorsey had six pluses going for him, the Blewetts have (at best) two zeros and four minuses.

*Dorsey*'s outcome and six-factor test leave little doubt over what to do here. The Act simply does not apply to individuals sentenced before its effective date, let alone five years before its effective date. But one need not take our word for how to read *Dorsey* or how to apply the six-factor test here. Listen to how the Court itself reads the opinion. Congress, it acknowledged, intended to follow the "ordinary practice [of] apply[ing] new penalties to defendants not yet sentenced, *while withholding that change from defendants already sentenced*." *Id.* at 2335 (emphasis added). That is today's case. Removing any doubt about the point, the Court acknowledged the reality that its decision would create a "disparity . . . between those pre-Act offenders already sentenced and those not yet sentenced as of [the Act's date of effectiveness]." *Id.* That too covers today's case. No disparity would exist if the Act applied to all previously sentenced defendants.

*All* of the participants in *Dorsey*, moreover, assumed that defendants sentenced before the Fair Sentencing Act's passage could not benefit from its provisions. The

Court made this assumption in the majority and dissenting opinions. *See id.*; *id.* at 2343 (Scalia, J., dissenting). So did the Justices at oral argument. *See* Transcript of Oral Argument at 34, 46. So did Dorsey. *See* Brief for Petitioner at 51. And so did the United States. *See* Brief for the United States at 23–24, 48–51. The Court-appointed amicus curiae summed it all up when he said that "everybody agrees" Congress did not want to reopen final sentences. Transcript of Oral Argument at 40. All of this may not amount to a binding holding from the Supreme Court. But according to a reliable source, circumstances like these "have much weight, as they show that this point neither occurred to the bar or the bench." *Bank of United States v. Deveaux*, 5 Cranch 61, 88 (1809) (Marshall, C.J.).

Precedents from our circuit have long accepted this interpretation. We have held in published opinions that the Fair Sentencing Act does not apply to individuals sentenced before its effective date. *See United States v. Bell*, 731 F.3d 552 (6th Cir. 2013); *United States v. Hammond*, 712 F.3d 333 (6th Cir. 2013). And we have adhered to the same rule in dozens of unpublished cases—enough to add a page and a half to this opinion had we wished to inflict the burden on our readers. *See, e.g.*, *United States v. Williams*, 522 F. App'x 278 (6th Cir. 2013); *United States v. Gooch*, 518 F. App'x 473 (6th Cir. 2013); *United States v. Tillman*, 511 F. App'x 519 (6th Cir. 2013).

Every other federal court of appeals—except the Federal Circuit, which does not hear criminal cases—has followed this path. *See United States v. Santos-Rivera*, 726 F.3d 17, 28 n.2 (1st Cir. 2013); *United States v. Diaz*, 627 F.3d 930, 931 (2d Cir. 2010) (per curiam); *United States v. Turlington*, 696 F.3d 425, 428 (3d Cir. 2012); *United States v. Mouzone*, 687 F.3d 207, 222 (4th Cir. 2012); *United States v. Kelly*, 716 F.3d 180, 181 (5th Cir. 2013); *United States v. Foster*, 706 F.3d 887, 888 (7th Cir. 2013); *United States v. Reeves*, 717 F.3d 647, 651 (8th Cir. 2013); *United States v. Augustine*, 712 F.3d 1290, 1294–95 (9th Cir. 2013); *United States v. Lucero*, 713 F.3d 1024, 1027 (10th Cir. 2013); *United States v. Hippolyte*, 712 F.3d 535, 542 (11th Cir. 2013); *United States v. Swangin*, 726 F.3d 205, 208 (D.C. Cir. 2013). Notwithstanding

hundreds if not thousands of opportunities, no other appellate court in the country has held to the contrary.

Last but not least, the Sentencing Commission, which is responsible for overseeing the guidelines and for implementing parts of the Fair Sentencing Act, has concluded that the changes to the statutory mandatory minimums do not apply retroactively. Nothing the Commission has done, it acknowledges, "make[s] any of the statutory changes in the Fair Sentencing Act of 2010 retroactive." 76 Fed. Reg. 41,332, 41,333 (July 13, 2011).

Swimming against this tide, the Blewetts target an alleged anomaly that arises from our conclusion. Suppose, the Blewetts point out, that the district court had sentenced Cornelius to the minimum of 120 months but Jarreous to 125 months because Jarreous possessed more cocaine. In this scenario, the Blewetts correctly observe, Jarreous could get a five-month sentence reduction (down to the mandatory minimum), but Cornelius, already at the minimum, would get nothing.

Yet this result says nothing about the forward-looking or backward-looking nature of the Fair Sentencing Act. It instead says something about, and is a potential consequence of, *all* statutory minimum and maximum sentences, whether in the Fair Sentencing Act or elsewhere. Suppose once more that the district court starts out intending to give Cornelius 120 months and Jarreous 125. But in this example, the district court becomes acquainted with the defendants' efforts to rehabilitate themselves, and decides that each deserves a reduction. In this instance, Jarreous could profit from this mitigating circumstance, but Cornelius, already at the minimum, could not. It works the same way with statutory maximums. Suppose that the district court started out wishing to give both cousins the maximum sentence permitted by the statute yet one of them deserved an even higher sentence due to the aggravating circumstances of his crime. Here, too, the court would have to treat the cousins the same, even though one of them committed a worse crime. None of this is anomalous; it is a natural consequence of having cliff-creating mandatory minimum or maximum sentences in the first place. As the Supreme Court has acknowledged, "[w]hereas guidelines seek a smooth

continuum, mandatory minimums result in 'cliffs.'" *Neal v. United States*, 516 U.S. 284, 292 (1996) (quoting United States Sentencing Commission, Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System iii (1991)).

What is more, the whole point of *any* retroactivity debate is whether to apply more lenient penalties to everyone or to apply them only to those sentenced after the new law takes effect. And the whole point of § 109 is to *create a presumption in favor of a disparity* between people who offended before a decrease in statutory penalties and people who offended after. Because § 109 mandates greater cliffs/mismatches/disparities between the two groups of individuals in the normal course, it hardly respects the saving statute to allow more modest disparities to drive the retroactivity analysis. The lead dissent authored by Judge Rogers mentions the saving statute once in a quotation from *Dorsey,* and it is fair to ask whether the dissent has flipped the § 109 presumption against retroactivity into a presumption in favor of it.

In a variation on this theme, the lead dissent finds the following two propositions irreconcilable: (1) that Congress wanted the new statutory minimums to be prospective (2) but it wanted the new guidelines to be retroactive. To eliminate the inconsistency between these two statements, the lead dissent concludes that the first statement must be false. But it offers no explanation for this question-begging choice. One could eliminate the inconsistency just as readily by saying that the second statement is false or by considering why both statements could be true.

The Fair Sentencing Act, for what it is worth, offers little guidance on whether the second statement is true or false. The Act, as *Dorsey* explains, affirmatively instructs the Sentencing Commission to use the new ratios for all *future* sentences. *See* 124 Stat. 2374, § 8; *Dorsey*, 132 S. Ct. at 2332, 2335. The Act does not tell the Commission to use the new ratios for all *past* sentences—that is, to make the new ratios retroactive. At first, indeed, the Commission adopted the new ratios only prospectively. *See* 75 Fed. Reg. 66,188 (Oct. 27, 2010). Months later, the Commission solicited public comments about whether to make the new ratios retroactive. *See* 76 Fed. Reg. 24,960 (May 3,

2011).   Later still, almost a year after the Fair Sentencing Act became law, the Commission finally voted for retroactivity.  *See* 76 Fed. Reg. 41,332 (July 13, 2011).

If the Commission's year-later choice was legitimate, as the lead dissent assumes, that is not because Congress directed it to do so.  The only congressional directive concerned new ratios for *future* sentences.  All that could justify the Commission's authority to make the new guidelines retroactive is its authority to fill the gap in the Fair Sentencing Act and to construe its own guidelines and policy statements.  Let us assume for the sake of argument that the Commission indeed had such authority and thus permissively made the guidelines retroactive to individuals previously sentenced.  But if that is true, no principle of administrative deference would allow us to accept the Commission's judgment on that score and ignore its contrary judgment on a related score—whether the Fair Sentencing Act applied to individuals already sentenced.  Its opinion on this last point is unequivocal:  The Commission explained that its decision "only allows the guideline changes to be considered for retroactive application; it does not make any of the statutory changes in the Fair Sentencing Act of 2010 retroactive." 76 Fed. Reg. at 41,333.  If the lead dissent wishes to respect the Commission's administrative authority to make the guidelines retroactive based on its interpretation of the Act, § 109 and § 3582, it should respect the Commission's view that this authority ends at the door of congressional mandatory minimums.  To do otherwise is a bait and switch.

Nor was the Commission's choice an unusual one or for that matter an "incoherent anomaly."  Dissenting Op. at 66 (Rogers, J.).  The point of mandatory minimums and maximums, for better or worse, is to give Congress more control over sentencing.  It makes considerable sense that the Commission would think it has discretion to operate outside the minimums, including by making changes retroactive, but would respect Congress's control over minimums and maximums by declining to make changes that cross this line.  It merely shows that the Commission sees this the same way we do—and for that matter the way every appellate court in the country has seen it.

In focusing on the Sentencing Commission's decision to make the new guidelines partially retroactive as the reason why the Fair Sentencing Act is retroactive, the lead dissent's theory creates another problem. It would mean that the new minimums were not retroactive when the Act took effect but *became* retroactive a year later when the Commission decided to make the corresponding guidelines retroactive. As the dissent puts it, "The Sentencing Commission . . . made the Fair Sentencing Act-driven guidelines retroactive. Doing so provided the statutory key to making the statutory minimum changes [retroactive]." Dissenting Op. at 66 (Rogers, J.).

This theory of springing retroactivity has no antecedents. Under this reading, the Fair Sentencing Act gave the Sentencing Commission the power to decide which minimums, new or old, would apply to offenders already sentenced and in the process allowed a retroactive alteration of the Act to spring forth like a jack-in-the-box at a date of the Sentencing Commission's choosing. Besides its novelty, the theory raises serious constitutional doubts. The constitutionality of the Sentencing Commission depends on the premise that Congress did not "vest in the [Commission] the legislative responsibility for establishing minimum and maximum penalties." *Mistretta v. United States*, 488 U.S. 361, 396 (1989).

The lead dissent adds that *all six* of *Dorsey*'s factors support treating the Fair Sentencing Act as fully retroactive. *See* Dissenting Op. at 60 (Rogers, J.). That is an aggressive reading of the decision, one disclaimed by *Dorsey*, 132 S. Ct. at 2335 ("[The Fair Sentencing Act creates a] new disparity . . . between those pre-Act offenders already sentenced and those not yet sentenced as of [the Act's effective date]."), and one yet to find support from a single other appellate court in the country.

Judge White goes one step beyond Judge Rogers, indeed a step beyond what the Blewetts or anyone else has argued in this case. She maintains that Congress affirmatively wanted the Sentencing Commission to decide whether to make the new mandatory minimums retroactive—and that the Commission exercised this authority by making the minimums retroactive. The short answer is: when and where? Nothing in the text of the Fair Sentencing Act or the Commission's handiwork offers any support

for this theory.  Nor does the dissent reconcile this theory with the Supreme Court's assurance that Congress did not want "to impose an unforeseeable, potentially complex application date" when it passed the Act.  *Id.* at 2336.  Nor does it explain why we should force upon the Commission a power that the Commission disclaims.  *See supra* at 10.  Nor does it explain why, as recently as September 25, 2013, the chair of the Sentencing Commission recommended to the Senate Judiciary Committee "that the provisions of the Fair Sentencing Act of 2010, which Congress passed to reduce the disparity in treatment of crack and powder cocaine, be made retroactive."  *Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences: Hearing Before the Sen. Comm. on the Judiciary*, 113th Cong. 2 (2013) (statement of Patti B. Saris, Chair, U.S. Sentencing Comm'n).  There would be no need for Congress today to make the minimums retroactive if the Commission already did so at some still-unidentified date in the past.

The support for this theory apparently comes from a 1994 law establishing a "safety valve" from mandatory minimums and providing that the new rules "shall apply to all sentences imposed on or after the 10th day beginning after the date of enactment." 108 Stat. 1796, 1986.  The dissent claims that the absence of a similar clause in the Fair Sentencing Act shows that the Act left its effective date up to the Sentencing Commission.  This theory overlooks a simpler explanation for the inclusion of this clause in the 1994 statute.  By default under the saving statute, the new safety valve would not have applied to people who offended before the statute's effective date, even those sentenced after the effective date.  *See* 1 U.S.C. § 109.  In order to overcome this default rule, Congress *had* to provide that the safety valve "shall apply to *all* sentences imposed" after the effective date.  The effective date provision in the 1994 law thus confirms the importance, not the irrelevance, of the saving statute, and that Congress knows how to overcome it.

In the last analysis, all indicators of meaning—the default rule that reductions in criminal penalties are not retroactive, the absence of any language in the Fair Sentencing Act that overcomes this presumption, the outcome, reasoning and assumptions of

*Dorsey*, a cascade of authority from our court and every other court of appeals, and the Sentencing Commission's own interpretation—show that the Act does not apply to defendants sentenced before its effective date. That would be the end of this dispute but for another law—18 U.S.C. § 3582(c)(2)—which the Blewetts claim allows them to sidestep this conclusion.

## B.

*Section 3582(c)(2).*    Enacted as part of the Sentencing Reform Act of 1984, § 3582(c)(2) permits inmates to seek a sentence reduction in a specific setting: "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. § 994(o)." This provision does not cover the Blewetts' request, as Judge Gilman ably explained at the panel stage of this dispute. *See United States v. Blewett*, 719 F.3d 482, 496–97 (6th Cir. 2013) (Gilman, J., dissenting). It applies only to sentencing ranges decreased "by the Sentencing Commission" in accordance with "§ 994(o)." In the Fair Sentencing Act, Congress, not the Sentencing Commission, lowered these mandatory minimum criminal penalties. Congress is not the Sentencing Commission. *Compare* U.S. Const. art. I, § 1 (establishing Congress), *with* 28 U.S.C. § 991(a) (establishing the Sentencing Commission). When Congress lowers a penalty, it acts under Article I of the Constitution, not 28 U.S.C. § 994(o). It follows that a mandatory minimum subsequently lowered by Congress is not, as § 3582(c)(2) requires, a "sentencing range . . . subsequently . . . lowered by the Sentencing Commission pursuant to 28 U.S.C. § 994(o)."

Not only does the straightforward language of § 3582(c)(2) limit its coverage to decreases in sentencing ranges made by the Sentencing Commission, but two features of its adoption cement this interpretation. The statute came into being through the Sentencing Reform Act of 1984, which created the Sentencing Commission and authorized the sentencing guidelines system. It is unsurprising that Congress would limit this "narrow" sentence-reduction option, *Dillon v. United States*, 130 S. Ct. 2683,

2691 (2010), to retroactive modifications of the sentencing guidelines by the Sentencing Commission, not to non-retroactive modifications of criminal laws by Congress.

That leads to the second point. Under the Sentencing Reform Act of 1984, the Sentencing Commission has no authority to contradict congressional mandatory minimum sentences. 28 U.S.C. § 994(b)(1). In upholding the Sentencing Reform Act against a non-delegation challenge, the Supreme Court relied on the premise that the Commission's decisions had to "be consistent with pertinent provisions of Title 18 of the United States Code." *Mistretta*, 488 U.S. at 375. If, as we conclude, the Fair Sentencing Act of 2010 does not apply to sentences imposed before its effective date, nothing in § 3582(c)(2) in particular or in the Reform Act of 1984 in general permits the Sentencing Commission to override that conclusion.

Section 3582(c)(2) thus permits criminal defendants to seek a sentence reduction when the Sentencing Commission lowers a guidelines range. But it does not permit criminal defendants to transform a non-retroactive reduction in penalties enacted by Congress into a retroactive one.

In response, the Blewetts offer a creative, but in the last analysis unconvincing, line of argument. It goes like this: (1) at their sentencing hearings in 2005, the Sentencing Guidelines recommended a sentencing range of 120–137 months for Cornelius and 120–125 months for Jarreous; (2) after passage of the Fair Sentencing Act in 2010, the Sentencing Commission adopted Amendment 750, which reduced sentencing ranges for crack cocaine offenders and today would give Cornelius 63–78 months and Jarreous 70–87 months; (3) this amendment allows affected defendants to seek a sentence reduction under § 3582(c)(2); and (4) the court therefore must apply the new mandatory minimum statutory sentences for crack cocaine offenses, not the old ones, in deciding the § 3582(c)(2) motion.

The problem with this theory is that it treats § 3582(c)(2) as an alchemist's stone, capable of transforming a prospective law into a retroactive one. All a defendant needs to do is somehow get into a sentence reduction proceeding. Once there, he can take advantage of any changes to mandatory minimum statutes—retroactive or not, related

to the Fair Sentencing Act or not—made since his initial sentencing. At least four roadblocks stand in the way of this interpretation.

*First*, the argument overlooks "the limited scope and purpose of § 3582(c)(2)." *Dillon*, 130 S. Ct. at 2692. Sentence modification proceedings are not "plenary resentencing proceedings." *Id.*; *see Blewett*, 719 F.3d at 497 (Gilman, J., dissenting). Section 3582(c)(2) allows consideration only of retroactive amendments to the sentencing guidelines, with other sentencing elements—mandatory minimums included—held constant.

*Second*, the argument proves too much. Suppose the Fair Sentencing Act contained a clause saying, "This Act does not apply to offenders sentenced before its passage." Even then, the Blewetts' theory would mean that the Sentencing Commission's retroactive reduction of the crack guidelines would allow them to enter a sentence reduction proceeding. And, even then, their theory would mean that, once there, they could benefit from the Act's new minimums. How odd to give a law retroactive effect even though it said it did not have retroactive effect. Nor does this problem go away because the current law lacks an anti-retroactivity clause. Instead of appearing in the Fair Sentencing Act, a clause with similar effect appears in a neighboring law that covers *all* laws that lower criminal sentences: § 109, the general saving statute.

*Third*, the Sentencing Commission, no fan of the crack-powder disparities, disavows the Blewetts' interpretation. One of its policy statements—which § 3582(c)(2) requires courts to follow—states that "a reduction in the defendant's term of imprisonment is not authorized" to the extent blocked by "the operation of another . . . statutory provision (e.g., a statutory mandatory minimum term of imprisonment)." U.S.S.G. § 1B1.10 cmt. n.1. Here, "another . . . statutory provision"—the Anti-Drug Abuse Act—blocks reduction of the Blewetts' sentence beyond 120 months.

The Blewetts reply that the phrase "statutory provision" in § 1B1.10 refers to the Fair Sentencing Act, not to the Anti-Drug Abuse Act. But why? As shown, the Fair Sentencing Act does not govern offenders sentenced before its enactment, making it

implausible that a *guideline* of the Sentencing Commission would alter that *statutory* directive of Congress.  The guideline instead refers to the applicable "statutory provision"—the Anti-Drug Abuse Act.  We thus look to that law, not the Fair Sentencing Act, to figure out whether "another . . . statutory provision" prevents the Blewetts' sentences from getting any lower.  No other circuit in the country questions this interpretation.

Ending any doubt about this conclusion, the Sentencing Commission itself has announced that Amendment 750 "only allows the guideline changes to be considered for retroactive application; it does not make any of the statutory changes in the Fair Sentencing Act of 2010 retroactive."  76 Fed. Reg. at 41,333.  The very entity responsible for writing § 1B1.10, for lowering the guidelines sentencing ranges and for creating the pivot point of the Blewetts' argument thus disagrees that the retroactive lowering of the one (some guidelines ranges) has the effect of retroactively lowering the other (the mandatory minimums).

*Fourth*, the Blewetts' interpretation would make a fool's errand of *Dorsey*.  Under their theory, even if Dorsey had lost the debate about the meaning of the Fair Sentencing Act, he still could have brought a § 3582(c)(2) motion to get the benefit of the new mandatory minimums.  If that were true, why decide *Dorsey*?  The Justices have better things to do than to resolve difficult 5–4 issues that don't matter.  There remain more ways to say less, but we will leave it at that with respect to the statutory arguments.

## C.

*The Constitution.*  Even if the Fair Sentencing Act applies only to individuals sentenced after its effective date and even if § 3582(c)(2) does not convert the Act into a retroactive change to these mandatory minimums, the Blewetts claim that the Constitution's equal-protection and cruel-and-unusual-punishment principles give them relief.  Long before the passage of the Fair Sentencing Act, our court and others repeatedly rejected similar constitutional challenges to the crack and powder cocaine sentencing disparities.  *See United States v. Blair*, 214 F.3d 690, 702 (6th Cir. 2000) ("The law is well settled in this circuit that the [crack-powder] ratio withstands

constitutional scrutiny."); *see also, e.g.*, *United States v. Garcia-Carrasquillo*, 483 F.3d 124, 134 (1st Cir. 2007); *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009); *United States v. James*, 78 F.3d 851, 853 n.2 (3d Cir. 1996); *United States v. Burgos*, 94 F.3d 849, 876–77 (4th Cir. 1996); *United States v. Fisher*, 22 F.3d 574, 579 (5th Cir. 1994); *United States v. Chandler*, 996 F.2d 917, 918–19 (7th Cir. 1993) (per curiam); *United States v. Watts*, 553 F.3d 603, 604 (8th Cir. 2009); *United States v. Dumas*, 64 F.3d 1427, 1429–30 (9th Cir. 1995); *United States v. Cornelius*, 696 F.3d 1307, 1325 (10th Cir. 2012); *United States v. Solomon*, 848 F.2d 156, 157 (11th Cir. 1988) (per curiam); *United States v. Holton*, 116 F.3d 1536, 1548 (D.C. Cir. 1997). Congress's *mitigation* of the crack and powder disparities does not weaken these precedents; it strengthens them. Besides, the Blewetts cite no cases that call these conclusions into question. "This is not due to a lack of diligent research; it is due to the lack of any such cases." *Blewett*, 719 F.3d at 495 (Gilman, J., dissenting).

Observing that users of crack cocaine are predominantly black but users of powder are predominantly white, the Blewetts insist (along with the dissents authored by Judges Merritt, Cole, Clay and White, and with support from the concurrence in the judgment authored by Judge Moore) that a congressional failure to make the Fair Sentencing Act fully retroactive would violate the equal protection component of the Fifth Amendment's Due Process Clause. But this guarantee forbids only *intentional* discrimination. A law that lacks a "racially discriminatory purpose" does not become unconstitutional "solely because it has a racially disproportionate impact." *Washington v. Davis*, 426 U.S. 229, 239 (1976). No evidence shows that Congress acted with the purpose to discriminate when it refused to apply the Fair Sentencing Act to defendants—*all* defendants, white or black—sentenced before the Act took effect.

The Blewetts and Judge Clay add that Congress must have *foreseen* that its failure to make the Fair Sentencing Act fully retroactive would have a racially disproportionate impact. But as Judge Gilman rightly pointed out, *see* 719 F.3d at 495, that makes no difference. A disproportionate effect does not violate the Equal Protection Clause, even if it was foreseen. The Supreme Court has instructed us that the "intent"

in "intentional discrimination" means more than "intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). A violation arises only when a public official takes an action "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* No evidence exists that Congress refused to make the Fair Sentencing Act retroactive *because* this refusal would disproportionately harm black defendants.

This theory of discrimination also makes little sense. Is it really possible that the same Congress that was deeply concerned about racial justice when looking at future sentences suddenly became racist when contemplating past sentences? That is a heavy lift. A more basic explanation exists for what Congress did, and for what it failed to do, in the Fair Sentencing Act. The government has a powerful interest in avoiding the disruption of final sentences. *See Johnson*, 544 U.S. at 309; *Teague*, 489 U.S. at 309 (plurality opinion). Congress did nothing extraordinary or for that matter discriminatory when it respected this interest. It was merely sticking to what *Dorsey* called the "ordinary practice" in federal sentencing, "withholding [a] change from defendants already sentenced." 132 S. Ct. at 2335.

The Blewetts, joined by several of the dissents, insist that Congress acted "irrationally" by failing to make the Fair Sentencing Act fully retroactive. But the government has a strong interest in the finality of sentences, and the Fair Sentencing Act advances that interest. Ruling otherwise means forgetting *Armour v. City of Indianapolis*, which endorsed "the rationality of the distinction . . . the law often makes between actions previously taken and those yet to come," 132 S. Ct. 2073, 2082 (2012), and forgetting *Dillon v. United States*, which was "aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent . . . amendments," 130 S. Ct. at 2692.

Two of the dissents respond that, because Congress did not insist on the finality of sentences based on the old *guidelines*, it acted irrationally by insisting on the finality of sentences based on the old statutory *minimums*. *See* Dissenting Op. at 41–43 (Cole, J.); Dissenting Op. at 77–79 (White, J.). That does not follow. Congress created the

minimums, and the Commission created the guidelines.  It is eminently rational for Congress to decide the retroactivity of its creations and to allow the Commission to decide the retroactivity of *its* creations.  This argument also overlooks the reality that § 3582(c)(2) grants the district courts *discretion* to reduce sentences; it does not impose a mandate on them.  *Dillon*, 130 S. Ct. at 2692.  If the dissents' theory is correct, countless district court judges have violated the Equal Protection Clause by exercising this discretion to leave in place some old sentences but not others, and we apparently have aided and abetted those constitutional violations in countless decisions of our own that found no abuse of discretion.  Doubtful.

Turning to another part of the Constitution, the Blewetts and Judge Merritt (with support from Judge Moore's opinion) contend that the Eighth Amendment prohibits the continued imprisonment of a defendant sentenced under the old mandatory minimum laws.  Yet they cannot contend that their 10-year sentences were cruel and unusual when imposed.  After all, the Supreme Court has upheld a mandatory minimum of *life without parole* for possession of 672 grams of cocaine *without intent to distribute*.  *Harmelin v. Michigan*, 501 U.S. 957 (1991).  The Blewetts' crimes are less serious in one respect (they possessed less cocaine), but more serious in two others (they possessed with intent to distribute and they had prior felony drug convictions).  *Harmelin* precludes the conclusion that the Blewetts' much shorter mandatory minimum sentences were cruel and unusual.

The Blewetts persist that their sentences *became* cruel and unusual when Congress passed the Fair Sentencing Act.  But the Eighth Amendment is not a ratchet that makes a harsher system of penalties unconstitutional the moment a more lenient one is (prospectively) adopted, a theory that would have the perverse effect of discouraging lawmakers from *ever* lowering criminal sentences.  Withholding the benefits of a change from previously sentenced defendants at any rate is not "unusual"; it is the general practice in federal sentencing, as *Dorsey* and § 109 confirm.

The Blewetts turn last of all to the principle that courts should interpret statutes to avoid serious constitutional doubts.  *See Crowell v. Benson*, 285 U.S. 22, 62 (1932).

Yet a weak constitutional argument and a weak statutory argument do not add up to a strong constitutional avoidance argument. Just the opposite, as Judge Gilman explained. *See* 719 F.3d at 495–96. Avoidance permits the adoption of an interpretation only if that reading of the statute is "fairly possible." *Crowell*, 285 U.S. at 62. It is not "fairly possible" to read "Sentencing Commission" in § 3582(c)(2) to mean "Congress," or to interpret the Fair Sentencing Act to contain a clear implication of full retroactivity sufficient to displace the general saving statute's default rule. Avoidance comes into play when there is a "serious doubt," not just any doubt, about a statute's constitutionality. *Id.* The Supreme Court's decisions in cases like *Davis* and *Harmelin* leave no serious doubt about the constitutionality of § 3582(c)(2) and the Fair Sentencing Act as written.

* * * * *

At the end of the day, this is a case about who, not what—about who has authority to lower the Blewetts' sentences, not what should be done with that authority. In holding that the courts lack authority to give the Blewetts a sentence reduction, we do not mean to discount the policy arguments for granting that reduction. Although the various opinions in this case draw different conclusions about the law, they all agree that Congress should think seriously about making the new minimums retroactive. Indeed, the Fair Sentencing Act, prospective though it is, dignifies much of what the Blewetts are saying as a matter of legislative reform and may well be a powerful ground for seeking relief from Congress. Yet the language of the relevant statutes (the Fair Sentencing Act, § 109 and § 3582(c)(2)) and the language of the relevant decisions (*Dorsey*, *Davis* and *Harmelin*) leave us no room to grant that relief here. Any request for a sentence reduction must be addressed to a higher tribunal (the Supreme Court) or to a different forum altogether (the Congress and the President).

———————————

**CONCURRENCE**

———————————

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.  Each of our sister circuits has held that the Fair Sentencing Act does not apply to prisoners sentenced to the statutory minimum before the Act's effective date.  Majority Op. at 7 (collecting cases).   The Sentencing Commission shares this view, though it has repeatedly asked Congress to extend the Act's benefits to all prisoners serving sentences for crack-cocaine violations.  *See*, *e.g.*, *Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences:  Hearing Before S. Comm. on the Judiciary*, 113th Cong. 9 (2013) (statement of Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n).  Nothing in the statute's text leads me to conclude that these positions are in error.  Petitioners' arguments to the contrary are unconvincing, and therefore, I must concur in the majority's judgment to affirm the district court.  I write separately, however, to express several reservations.

**I.**

On June 3, 2013, Jarreous Blewitt completed his period of custodial imprisonment, and his eight-year term of supervised release began to run.   The government, as a result, asks us to dismiss Jarreous Blewitt's appeal as moot, but the majority sidesteps this motion.  Instead, the majority proceeds directly to the merits because it has "no doubt" as to our "jurisdiction over one of the defendants in this consolidated appeal . . . ."  Majority Op. at 3 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998); *Norton v. Mathews*, 427 U.S. 524, 531 (1976)).  I do not believe that Article III allows such a move, nor do I think the Supreme Court encourages us to take such a step.

## A.

The Constitution allows "federal courts [to] adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). Under Article III, we are "not empowered to decide moot questions or abstract propositions." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (internal quotation marks omitted). When—for whatever reason—the dispute discontinues or we are no longer able to grant meaningful relief to the prevailing party, the action is moot, and we must dismiss for lack of jurisdiction. *Knox v. Serv. Emp. Int'l Union*, 132 S. Ct. 2277, 2287 (2012). This is not a small or purely academic matter given that the "constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers . . . ." *Steel Co.*, 523 U.S. at 101.

The majority cites *Steel Co.* for the proposition that a federal court may reach the merits of a case—regardless of justiciability concerns—as long as the court holds that it has jurisdiction over one of the companion cases. Majority Op. at 3. In its hurry to reach the merits, however, the majority misses the main thrust of *Steel Co.*, and in doing so, it puts this court in direct conflict with the Supreme Court, our sister circuits, and scholars. In *Steel Co.*, Justice Scalia's majority explicitly rejected the doctrine of "hypothetical jurisdiction"—the practice of assuming jurisdiction when the merits provide a quicker and easier answer. 523 U.S. at 101 ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion . . . ."). As a result, the lower courts, including this one, have recognized that a federal court must satisfy itself of its jurisdiction, no matter how difficult, before reaching the merits of a case. *See, e.g.*, *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 651–52 (6th Cir. 2007); *In re LimitNone, LLC*, 551 F.3d 572, 576 (7th Cir. 2008); *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1116 (9th Cir. 2004); *see also* Wright, Miller & Cooper, *Federal Practice and Procedure* § 3533.1 (2008) ("[T]he Supreme Court appears to have ruled that a court may never bypass a difficult and important Article III [justiciability] question in favor of resolving an easy and nonprecedential question on the merits."). It is unclear how assuming that we have

jurisdiction over Jarreous Blewitt because we are empowered to act in Cornelius Blewett's case is anything but hypothetical jurisdiction.

Despite the strong, categorical language in *Steel Co.*, that case did recognize that "the absolute purity of the rule that Article III jurisdiction is always an antecedent question" had been "diluted" by previous cases. *Steel Co.*, 523 U.S. at 101. One of those cases was *Norton*, cited by the majority, in which the Court refused to address whether a three-judge district court had jurisdiction in the proceedings below because "the case alternatively could be resolved on the merits in favor of the same party." *Norton*, 427 U.S. at 532. Because "the merits ha[d] been rendered plainly insubstantial" in a companion case, *id.*, the *Norton* court avoided the "difficult and perhaps close jurisdictional arguments," *id.* at 530. Subsequent courts have interpreted the *Steel Co.* majority's choice to distinguish, rather than overrule, *Norton* as license to create exceptions to the general rule.[1] Perhaps, by citing *Steel Co.* and *Norton*, the majority here aims to take advantage of these safety valves. However, neither of the recognized exceptions is applicable here.

First, on occasion, we have joined other circuits in "permit[ting] courts to assume that *statutory* jurisdiction—as distinct from *constitutional* jurisdiction—exists in order to resolve a case, by means of a straightforward merits analysis, in favor of the party contesting jurisdiction." *Khodr v. Holder*, — F. App'x —, 2013 WL 4017141, at \*4 n.4 (6th Cir. 2013); *see also id.* (collecting cases). This exception fits with *Norton* itself, which skipped over whether facts existed that would satisfy the statute that provided for the convening of a three-judge district court. *Norton*, 427 U.S. at 529–30. It does not apply here, because the case and controversy requirements—including mootness—sound in Article III. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *SEC v. Med. Comm. for Human Rights*, 404 U.S. 403, 407 (1972); *Rice*, 404 U.S. at 246.

---

[1]Five justices did agree that exceptional circumstances might warrant the assumption of statutory jurisdiction. *See Steel Co.*, 523 U.S. at 110 (O'Connor, J., joined by Kennedy, J., concurring); *id.* at 111 (Breyer, J., concurring); *id.* at 112 (Stevens, J., joined by Souter, J., concurring in the judgment).

Second, other courts of appeals have recognized the slightly broader "foreordained exception." *See, e.g.*, *Starkey v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1261 (10th Cir. 2009) (collecting cases). One of our sister circuits has read *Steel Co.* and *Norton*

> to allow an exception to the rule against assuming the existence of standing in those "peculiar circumstances" where the outcome on the merits has been "foreordained" by another case such that "the jurisdictional question could have no effect on the outcome," provided the court "d[oes] not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed."

*Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 194 (2d Cir. 2002) (quoting *Steel Co.*, 523 U.S. at 98). Another circuit has similarly adopted this exception, but that court stressed that it avoids only "difficult question[s]" of jurisdiction, *Seale v. INS*, 323 F.3d 150, 157 (1st Cir. 2003), and that it "does not create new precedent," *id.* at 152. This case does not fit comfortably within such exceptions. Furthermore, whether we have jurisdiction in this case is relevant to many other 18 U.S.C. § 3582(c)(2) appeals. Thus, there is no reason to invoke this limited exception that has been recognized by only a few circuits. Instead, we should satisfy ourselves of our jurisdiction and address the government's motion to dismiss.

**B.**

Under our general procedure and mootness principles, the government's motion should nonetheless be denied. On prior occasions, we have stated that "'[t]he test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties.'" *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) (quoting *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc)). Traditionally, once a prisoner finishes his sentence of imprisonment, any challenge to the term of imprisonment (as opposed to the underlying conviction) cannot make a difference absent a showing of collateral consequences. *See Lane v. Williams*, 455 U.S. 624, 631 (1982) ("Since respondents elected only to attack their sentences, and since those sentences expired during the course of these proceedings, this case is

moot."). Here, U.S.S.G. § 1B1.10(b)(2)(C) bars a district court from reducing a prisoner's sentence below the term of imprisonment "already served," which would seem to render Jarreous Blewitt's appeal moot. However, we have recognized that "an appeal is not entirely moot 'so long as the appeal potentially implicates the length of the [defendant's] supervised release term.'" *United States v. Waltanen*, 356 F. App'x 848, 851 (6th Cir. 2009)[2] (quoting *United States v. Maken*, 510 F.3d 654, 656 n.3 (6th Cir. 2007)); *see also United States v. May*, 568 F.3d 597, 602 (6th Cir. 2009); *McClain v. Bureau of Prisons*, 9 F.3d 503, 505 (6th Cir. 1993). To take advantage of this exception, though, Jarreous Blewitt must demonstrate that a failure to grant him eligibility for a § 3582(c)(2) sentence reduction has collateral consequences for him. *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009); *see also Spencer v. Kemna*, 523 U.S. 1, 14 (1998).

In his response to the government's motion to dismiss, Jarreous Blewitt argues that a favorable outcome in this appeal could impact a district court's calculus when determining whether to modify or terminate his term of supervised release. Jarreous Blewitt Resp. at 2. I agree. In *United States v. Johnson*, 529 U.S. 53, 60 (2000), the Supreme Court held that terms of imprisonment and of supervised release are not

---

[2]In *Waltanen*, a panel dismissed a prisoner's appeal as moot, in part, because he "did not move the district court to reconsider his supervised release term." 356 F. App'x at 851; *see also United States v. Bravo*, 362 F. App'x 456 (6th Cir. 2010). Furthermore, the panel in *Waltanen* held that "any issue relating to early termination [of supervised release was] premature and not ripe for our consideration" because the prisoner had not been on supervised release for the one-year requirement embedded in 18 U.S.C. § 3583(e)(1). 356 F. App'x at 852. In my view, both of these conclusions are in error.

First, requiring a prisoner to file a § 3583 motion, in circumstances such as these, is overly formalistic and blind to reality. When Jarreous Blewitt filed for § 3582(c)(2) relief in district court, his petition was timely. When he won on appeal, his § 3582(c)(2) petition still was timely. Only now, after the government has sought en banc review—approximately eighteen months after the district court first ruled—is the mootness of Jarreous Blewitt's motion in question. To say that Jarreous Blewitt cannot get relief now because he did not make a § 3583 filing in district court, at a time when such a motion would not have been ripe, makes little sense.

Second, a determination that a § 3583(e)(1) motion would not be ripe until a prisoner has served one year of his term—is incorrect and unwise. Section 3583(e)(1) states that a court may terminate supervised release "any time after the expiration of one year of supervised release," but it is silent as to when a prisoner may file for relief. Requiring a prisoner to wait until one year of supervised release has passed to file a § 3583 petition would essentially tack on extra time and defeat the congressional judgment that a district court should have discretion to terminate supervised release after the first year has been served. *See United States v. Epps*, 707 F.3d 337, 344 (D.C. Cir. 2013). Such a requirement does not fit with the text of § 3583, and therefore, I would not support a decision imposing such a judicial amendment to the statute. Furthermore, § 3583(e)(2) allows a district court to "modify, reduce, or enlarge the conditions of supervised release, *at any time prior to the expiration or termination of the term of supervised release . . . .*" *Id.* (emphasis added); *see also United States v. Shultz*, — F.3d —, 2013 WL 5736052, at *5 (6th Cir. 2013) (noting that a defendant could seek a modification whenever the need arose). Therefore, a district court could proceed under § 3583(e)(2) in the alternative, even if this court chose unwisely to overread § 3583(e)(1).

"interchangeable," but "equitable considerations of great weight exist when an individual is incarcerated beyond the proper expiration of his prison term," which could impact a district court's § 3583 analysis. In circumstances similar to Jarreous Blewitt's, the D.C. Circuit has stated, "eligib[ility] for a reduced sentence under § 3582(c)(2), if it led to an actual sentence reduction, would necessarily inform the district court's evaluation of a motion for termination or reduction of [a] term of supervised release under § 3583(e)(1) or (e)(2)." *United States v. Epps*, 707 F.3d 337, 345 (D.C. Cir. 2013); *see also Levine v. Apker*, 455 F.3d 71, 77 (2d Cir. 2006); *Mujahid v. Daniels*, 413 F.3d 991, 994–95 (9th Cir. 2005). Here, Jarreous Blewitt cannot receive an actual reduction of his imprisonment term because U.S.S.G. § 1B1.10(b)(2)(C) precludes a district court from reducing a term of imprisonment below time "already served." The Sentencing Guidelines, however, direct district courts to "consider any such reduction that it was unable to grant [as a result of § 1B1.10(b)(2)(C)] in connection with any motion for early termination of a term of supervised release under 18 U.S.C. § 3583(e)(1)." U.S.S.G. § 1B1.10 cmt. n. 5(B). Therefore, a holding that Jarreous Blewitt is eligible for a § 3582(c)(2) sentence reduction renders a modification or termination of supervised release more likely, and thus, his appeal is not moot.

## II.

Regrettably, the Fair Sentencing Act—as written—does not benefit prisoners, like the petitioners, who were sentenced to the crack-cocaine mandatory minimums before the Act's effective date. The statute is silent as to its retroactive application, and statements of individual members of Congress, though eloquent and compassionate, cannot trump or supplement the text of the Act, which was passed by both houses of Congress and signed into law by the President. Thus, the general savings statute, 1 U.S.C. § 109, resolves this silence in favor of purely prospective application.

### III.

Petitioners challenge the district court's denial of a sentence reduction under 18 U.S.C. § 3582(c)(2).  Normally, federal courts cannot disturb or recalculate a prisoner's sentence once it is finally imposed, § 3582(b), but "[s]ection 3582(c)(2) establishes an exception to the general rule of finality . . . ." *Dillon v. United States*, 130 S. Ct. 2683, 2690 (2010).  The Supreme Court has further stated that it is "aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent Guidelines amendments."  *Id.* at 2692.  Rather, § 3582(c)(2) is merely "a congressional act of lenity."  *Id.*  Congress can always broaden this statutory right, or it can establish neutral roadblocks that result in the denial of relief to certain types of prisoners.  Currently, to be eligible for § 3582(c)(2) relief, a prisoner must show:  (1) that the Sentencing Commission amended a guideline range and made that amendment retroactive, *see* § 3582(c)(2); (2) that his sentence was "based on" the guideline range amended by the Sentencing Commission, *id.*; *Freeman v. United States*, 131 S. Ct. 2685, 2692–93 (2011) (plurality opinion); and (3) that the application of the new guideline range would actually "have the effect of lowering the defendant's applicable guideline range," U.S.S.G. § 1B1.10(a)(2)(B).

Petitioners here satisfy the first two requirements, but they cannot clear the final hurdle to eligibility.  The new guidelines do not have the effect of lowering petitioners' applicable guideline range because the new mandatory minimums are not retroactive.  The old mandatory minimums, like other statutory minimums, continue to block relief.  Given that there is no constitutional right to a sentence reduction and that Congress could abolish § 3582(c)(2) completely, I cannot say that Congress's choice to limit relief under § 3582(c)(2) to prisoners not subject to mandatory minimums presents a constitutional problem.  *Cf. Lindh v. Murphy*, 96 F.3d 856, 872 (7th Cir. 1996) (justifying 28 U.S.C. § 2254(d)'s limitation of federal habeas review on similar logic), *rev'd on other grounds*, 521 U.S. 320 (1997).

Importantly, under § 3582(c)(2), prisoners can seek only a sentence modification, and we can decide only whether they are eligible for a reduction.  Petitioners cannot

challenge the legality of their sentences or the sentencing courts' original calculations of the sentencing guidelines. *Dillon*, 130 S. Ct. at 2694. The power and discretion of the federal courts, as well as our scope of review, are similarly constrained under § 3582(c)(2). *Dillon*, 130 S. Ct. at 2691; *United States v. Washington*, 584 F.3d 693, 694 (6th Cir. 2009). As a result, the constitutionality of Cornelius Blewett's and Jarreous Blewitt's sentences is not before us today. But let there be no mistake: if a prisoner, who is serving a sentence based on the old mandatory minimums, challenged his sentence under 28 U.S.C. §§ 2241 or 2255, we could address the constitutional question directly.[3] Two decades ago, we held that sentences imposed pursuant to the 100-to-1 ratio did not violate the Fifth or the Eighth Amendments. *See United States v. Williams*, 962 F.2d 1218, 1227–28 (6th Cir. 1992) (Equal Protection); *United States v. Levy*, 904 F.2d 1026, 1034 (6th Cir. 1990) (Eighth Amendment). For the reasons stated below, I lack faith in the soundness of those decisions.

## A. Equal Protection

The federal government may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (applying the Fourteenth Amendment's commands to the federal government through the Fifth Amendment). At one point, these blunt words meant "'that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; . . . that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses.'" *Yick Wo v. Hopkins*, 118 U.S. 356, 367–68 (1886) (quoting *Barbier v. Connolly*, 113 U.S. 27, 31 (1884)). Today, this fundamental protection prevents the federal government from enforcing its laws in a racially discriminatory manner or maintaining statutes that are no longer rationally related to a legitimate end.

---

[3] The petitioners neither ask us to construe their § 3582(c)(2) motions as applications for habeas relief nor challenge the constitutionality of their sentences. Thus, we cannot rule on the question now.

"Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice," because it "destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process." *Rose v. Mitchell*, 443 U.S. 545, 555–56 (1979). Such discrimination "not only violates our Constitution," but also "is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130 (1940) (footnote omitted). In 2012, 82.6 percent of convicted federal crack-cocaine defendants were African American, yet African Americans represent only one-third of crack-cocaine users in the United States. U.S. Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* 103 tbl. 34 (2012); H.R. Rep. No. 111–670, at 4 (2010) (citing Substance Abuse & Mental Health Servs. Admin., *Results from the 2005 National Survey on Drug Use and Health: Detailed Table J*, tbl. 1.43a (Sept. 2006)). In the same time-frame, only 6.7 percent of convicted federal crack-cocaine defendants were Caucasian, despite the fact that the majority of users is white. U.S. Sentencing Comm'n, *Sourcebook*, at 103 tbl. 34. No conception of equality, no decent government, can long tolerate a criminal-justice system in which its citizens are treated so differently if such treatment is based on the color of their skin.

On its face, the 100-to-1 ratio is not a racial classification, and thus, proof of disparate impact is not enough. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977). The Supreme Court also requires a demonstration that the discriminatory enforcement of the law is motivated by a discriminatory purpose, *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987), that the government "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In most cases, satisfying this standard requires particularized proof of motive, *see, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 465 (1996), yet "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S. at 266. In those rare situations, "[t]he evidentiary inquiry is then relatively easy." *Id.*

The federal government's enforcement of the crack-cocaine laws is stark and wildly disproportionate in its effects. Since Congress created the 100-to-1 ratio in 1986, African Americans have constituted eighty to ninety-five percent of federal crack-cocaine defendants while continuing to be a minority of crack-cocaine users. *See, e.g.*, U.S. Sentencing Comm'n, *Sourcebook*, at 103 tbl. 34; David A. Sklansky, *Cocaine, Race, and Equal Protection*, 47 Stan. L. Rev. 1283, 1289 (1995) (citing U.S. Sentencing Comm'n, *Annual Report* 46, 88 (1992)). While the 100-to-1 ratio was in effect, the average federal drug sentence for African Americans was forty-nine percent longer than the average federal drug sentence for Caucasians. Barbara S. Meierhoefer, Fed. Judicial Ctr., *The General Effect of Mandatory Minimum Prison Terms* 20 (1992) (reporting data as of 1990). The impact of this policy was, and is, felt beyond the prison walls. *See generally* Michelle Alexander, *The New Jim Crow* 140–77 (rev. ed. 2012). At minimum, these statistics begin to suggest a criminal-justice system that treats one race much harsher than others. If true, this cannot stand. "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). By burdening one race above all others, the enforcement of the 100-to-1 ratio has potentially offended the Constitution's basic guarantee of equal treatment.

Even if the current binding constitutional doctrine does not allow the application of strict-scrutiny analysis, the 100-to-1 ratio must still survive rational-basis review to remain valid. Supreme Court precedent teaches that "if a law neither burdens a fundamental right nor targets a suspect class, we [must] uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). "[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). When faced with "'[d]iscriminations of an unusual character,'" however, we must provide "careful consideration." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *Romer*, 517 U.S. at 633).

In *Williams*, this circuit in 1992 upheld the 100-to-1 ratio against a generic rational-basis challenge because Congress then believed that (1) crack cocaine is pharmacologically different than powder cocaine and (2) the effects of crack-cocaine trafficking are more extreme. 962 F.2d at 1227. These assumptions underlying the 100-to-1 ratio may have been rational and constitutional in 1986 or 1996, "but history makes clear that constitutional principles of equality, like constitutional principles of liberty, property, and due process, evolve over time; what once was a 'natural' and 'self-evident' ordering later comes to be seen as an artificial and invidious constraint on human potential and freedom." *Cleburne*, 473 U.S. at 466 (Marshall, J., concurring and dissenting in part). Moreover, "[s]hifting cultural, political, and social patterns at times come to make past practices appear inconsistent with fundamental principles upon which American society rests, an inconsistency legally cognizable under the Equal Protection Clause." *Id.*

The experience of the past quarter-century has drawn the rationality of the 100-to-1 ratio into question. As my dissenting colleagues explain, the validity of the Congress's original assumptions may not survive careful consideration today. *See* Cole, J., dissenting at 39–40; Clay, J., dissenting at 42–49; *see also United States v. Smith*, 73 F.3d 1414, 1418–22 (6th Cir. 1996) (Jones, J., concurring). Furthermore, rather than protecting our citizens, the law has led to the mass incarceration of African-American men and has bred distrust of law enforcement in the larger African-American community. It is time that the federal judiciary determines again whether the Constitution abides such actions.

## B. Eighth Amendment

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." While these words may be imprecise, the Supreme Court has held that the "Amendment contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are grossly disproportionate to the crime.'" *Graham v. Florida*, 130 S. Ct. 2011, 2021 (2010)

(quoting *Harmelin v. Michigan*, 501 U.S. 957, 997, 1000–01 (1991) (Kennedy, J., concurring)).  When considering whether a sentence is grossly disproportionate, we are largely "guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions."  *Solem v. Helm*, 463 U.S. 277, 292 (1983).  But in addition, we must remember that "[t]he Amendment . . . draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society."  *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).

In *Levy*, *United States v. Avant*, 907 F.2d 623 (6th Cir. 1990), and *United States v. Pickett*, 941 F.2d 411 (6th Cir. 1991), we upheld the 100-to-1 ratio against Eighth Amendment challenges.  A panel noted in *Levy*—without much explanation—that "[a] ten-year sentence for drug possession simply does not approach the same level of gross inequity" that had previously been held unconstitutional.  904 F.2d at 1034 (quoting *United States v. Cyrus*, 890 F.2d 1245, 1248 (D.C. Cir. 1989)).  In *Avant*, a panel stated that a ten-year sentence for possessing 7.3 grams of crack cocaine was "severe," but nonetheless constitutional.  907 F.2d at 627.

In the past two decades, however, new information and events have cast doubt upon the continued validity of those decisions.  Congress has passed the Fair Sentencing Act, lowering the disparity between crack and powder cocaine.  The Sentencing Commission has, in turn, lowered the guidelines for crack cocaine.  As of 2007, "[o]nly 13 states ha[d] some form of distinction between crack cocaine and powder cocaine," none of which employed a 100-to-1 ratio or worse.  U.S. Sentencing Comm'n, *Report to the Congress:  Cocaine and Federal Sentencing Policy* 98–104 (2007).  Since then, Missouri has lowered its ratio from 75-to-1 down to 18.75-to-1.  *Compare* Mo. Rev. Stat. § 195.222(2) (2011) *with* Mo. Rev. Stat. § 195.222(2) (2013).  Now, only Missouri, Arizona (12-to-1), and New Hampshire (28-to-1) have ratios above 10-to-1.  *See* Ariz. Rev. Stat. §§ 13-3408(A)(2), (B)(2); 13-3401(36)(b), (c); N.H. Rev. Stat. § 318-B:26(I)(a)(1), (3).  In short, no American jurisdiction today treats crack-cocaine

offenders in such a disproportionate way as the federal government did prior to the Fair Sentencing Act. These changes, particularly when considered in conjunction with the new information discussed above in Section III(A) of this opinion and in the dissents, suggest that the mandatory minimums in force before the enactment of the Fair Sentencing Act now constitute grossly disproportionate punishment. At the very least, we should reconsider whether *Levy* and its progeny still remain good law.

***

The majority cites *Washington v. Davis*, 426 U.S. 229 (1976), and *Harmelin* to show the limits of our Constitution. It might as well add *Armstrong* and *McCleskey* to its parade of horribles. I do not concede that these cases foreclose a challenge to the 100-to-1 ratio today, nor do I believe that mistakes should be repeated and relied upon to shrink further our constitutional protections. History and experience can reveal that our past decisions were wrong, and thankfully we are not forever bound by a cramped reading of our charter of government. Still, I am mindful that "[i]t is not for our court, as an inferior one, to give full expression to any personal inclination any of us might have and to take the lead in expanding constitutional precepts when we are faced with a limiting Supreme Court decision which, so far as we are told directly, remains good law." *Jones v. Alfred H. Mayer Co.*, 379 F.2d 33, 43 (8th Cir. 1967) (Blackmun, J.), *rev'd*, 392 U.S. 409 (1968). If the 100-to-1 ratio remains constitutional under those decisions, I will apply them and remain faithful to my oath. But I nonetheless look forward to a day when our law reflects the full promise of our Constitution and our sentencing policy is more colorblind, more compassionate, and more fair.

For the reasons stated above, I concur in the judgment.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting.  I agree with Judge Rogers' dissenting opinion that the Fair Sentencing Act displays a congressional intent for the U.S. Sentencing Commission to draft a new set of greatly reduced crack cocaine guidelines to be applied both to new and old crack cocaine offenses.  This remedial intent, as set out in my original panel opinion in this case, *United States v. Blewett*, 719 F.3d 482 (May 17, 2013), includes mandatory minimum sentences in order to correct the wrongs of the past.  Congress specifically repealed the old mandatory minimums as excessive and unfair in order to "restore fairness."  It replaced the old excessive sentences with greatly reduced mandatory minimum sentences.  Congress wanted change, not the *status quo*.  Congress knew that a large number of the long sentences to be reviewed under § 3582(c)(2) were mandatory and that most of the defendants were African-American.[1]

---

[1]On September 18, 2013, the Sentencing Commission reported some of its findings on the consequences of applying the new mandatory minimums to all defendants:

> The Commission has determined that, should the mandatory minimum penalty provisions of the FSA be made fully retroactive, 8,829 offenders would likely be eligible for a sentence reduction, with an average reduction of 53 months per offender. That would result in an estimated total savings of 37,400 bed years over a period of several years and to [sic] significant cost savings. The Commission estimates that 87.7 percent of the inmates eligible for a sentence reduction would be Black.

> Statement of Judge Patti B. Saris, Chair, United States Sentencing Comm'n for the Hearing on "Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences" before the Comm. on the Judiciary, United States Senate, Sept. 18, 2013 (footnotes omitted).  At $30,000 a "bed year," the budgetary savings would exceed $1.1 billion.  The change would also eliminate much of the racial discrimination in sentencing that the legislative history of the FSA acknowledged had been a part of the crack/powder cocaine sentencing disparity.

> Here is a small but representative sample of the many statements by members of Congress concerning the purpose of the Fair Sentencing Act:

> 155 Cong. Rec. S10491 (daily ed. Oct. 15, 2009) (statement of Sen. Dick Durbin, Assistant Senate Majority Leader) ("Vice President Joe Biden, one of the authors of the legislation creating this disparity in sentencing, has said:  'Each of the myths upon which we based the disparity has since been dispelled or altered.'"); 156 Cong. Rec. H6202 (daily ed. July 28, 2010) (statement of Rep. Robert C. "Bobby" Scott, Chairman of the House Judiciary Subcommittee on Crime, Terrorism and Homeland Security) ("We are not blaming anybody for what happened in 1986, but we have had years of experience and have determined that there is no justification for the 100-to-1 ratio."); 156 Cong. Rec. H6202 (daily ed. July 28, 2010) (Statement of Rep. Daniel E. Lungren) ("We initially came out of committee with a 20-to-1 ratio.  By the time we finished on the floor, it was 100-to-1.  We didn't really have an evidentiary basis for it, but that's

I agree also with the dissent that the intent behind this congressional action to "restore fairness" is inconsistent with enforcing a "no-change" sentencing policy based on a doctrine of "finality" that the majority repeatedly relies on to deny relief throughout its opinion. The majority is mistaken in suggesting that it is the "government" that wants "to avoid disrupting the finality" of the old sentences. It is not Congress that has suggested "finality" as the governing policy. Only the Department of Justice as a party to this action, and the court itself, take that position. The "finality" of the mandatory sentences in this case is not a "default" position or the norm as the majority mistakenly asserts. Rather the opposite is true. The cases are to be further reviewed under § 3582(c)(2) to "restore fairness" and remedy the wrongs of the past.

Both the National Association of Criminal Defense Lawyers and the NAACP have filed *amicus* briefs arguing that the position of the Department of Justice in this case, if upheld, creates a sentencing system so disproportionate, irrational and racially biased that it violates the proportionality requirement of the Eighth Amendment and the equal protection requirements of the Fifth and Fourteenth Amendments.

Once again the majority answers these arguments with its "strong-interest-in-finality" policy, attributing this reason to Congress. But it is not Congress that has created this situation. It intended, as Judge Rogers' opinion makes clear, to greatly reduce such sentences. It is the court itself in its misunderstanding of congressional intent that has introduced irrationality and disproportionality into the system that Congress intended to correct.

It is not Congress' but this court's decision to create the vast disproportionality in sentencing when it denies authority to reduce the Blewetts' mandatory sentences from

---

what we did, thinking we were doing the right thing at the time.");156 Cong. Rec. S1682 (daily ed. Mar. 17, 2010) (statement of Sen. Patrick Leahy) ("The racial imbalance that has resulted from the cocaine sentencing disparity disparages the Constitution's promise of equal treatment for all Americans."); 156 Cong. Rec. H6198 (daily ed. July 28, 2010) (statement of Rep. James E. Clyburn, House Majority Whip) ("The current drug sentencing policy is the single greatest cause of the record levels of incarceration in our country. One in every 31 Americans is in prison or on parole or on probation, including one in 11 African Americans. This is unjust and runs contrary to our fundamental principles of equal protection under the law."); 156 Cong. Rec. H6203 (daily ed. July 28, 2010) (statement of Rep. Steny Hoyer) ("The 100-to-1 disparity is counterproductive and unjust.").

ten years to zero years, as provided in the new Act.  The court visits that disparity on a prison population that is ninety percent African-American.  Both the Department of Justice and this court know the facts, the degree of disproportionality, the irrationality of the disparity, and the racial makeup of the prison population that must suffer the consequences.  It chooses to disregard these facts in favor of its overriding policy of "finality."

I am convinced by the argument of the National Association of Criminal Defense Lawyers on the disproportionality and irrationality of the position of the Department of Justice, now adopted by our court.  In its *amicus* brief it argues:

> Unless the government can put forward legitimate penological justifications for refusing the Blewetts (and similar less-serious, lower-quantity crack offenders) the opportunity to apply for sentence modifications under 18 U.S.C. § 3582(c)(2) based on the FSA's more lenient crack sentencing provisions, their sentences are "by their nature disproportionate to the offense," *Graham*, 130 S. Ct. at 2028, and a purposeless mandate that they serve out the full duration of now-repealed, excessive pre-FSA mandatory minimum sentences would result in significant and enduring Eighth Amendment violations.  [Citing *Graham v. Florida*, 130 S. Ct. 2011, 2028 (2010).]

Amicus Brief, National Association of Criminal Defense Lawyers, p. 13.

The *amicus* brief of the NAACP extends the irrationality and disproportionality argument to take into account the consequences for African-Americans under the Equal Protection Clause.  Relying on numerous Sentencing Commission reports like the September 13, 2013, report quoted in footnote 1 above, the NAACP argues throughout its amicus brief that the disproportionality in crack sentencing falls primarily on African-American defendants.  It argues that the purpose of Congress was to remedy the discrimination, not to suppress it or cover it up by foreclosing the opportunity for sentence modification under § 3582(c)(2).  I agree with the NAACP argument that the majority's failure to allow review of the old mandatory sentences simply perpetuates the racial discrimination that the FSA was designed to change.  These mandatory sentences are in some instances as long as life imprisonment.  The "no-change" policy of the Department of Justice and our court in denying review has grave consequences for many

thousands of imprisoned African-Americans that deserve to be released earlier in light of the new statute and guidelines and the grossly excessive sentences of the past that practically all observers now recognize.

———————————

## DISSENT

———————————

COLE, Circuit Judge, dissenting.  I join all but the last paragraph of Judge Rogers's persuasive dissent.  I write separately to explain my view that applying the 100-to-1 mandatory minimums to deny eligibility for § 3582(c)(2) proceedings violates equal protection principles.

There is no question now that the 100-to-1 ratio disproportionately affects African Americans.  African-American crack users are more likely to be convicted of federal crack offenses than their White counterparts.  Last year, for example, African Americans made up 30% of reported crack users but 83% of federal crack convicts.[1] White people, in contrast, accounted for 62% of users but only 7% of convicts.  Federal crack convicts, substantially more likely to be African-American, receive longer sentences than powder cocaine convicts.  In 2007, under the 100-to-1 ratio and before the Sentencing Commission sought to mitigate modestly the disparity, the average crack sentence was 50% longer than the average powder cocaine sentence.[2]  And more generally, the 100-to-1 ratio yields a sentencing guideline range three to six times longer for crack offenders than powder cocaine offenders with the same drug quantities.[3]  It is hardly a revelation that the ratio negatively affects African Americans more than White people.  The Sentencing Commission reported so to Congress in 1995 ("The 100-to-1 crack cocaine to powder cocaine quantity ratio is a primary cause of the growing disparity between sentences for Black and White federal defendants."), and again in 1997 ("[S]entences appear to be harsher and more severe for racial minorities than others

———————————

[1]*See* Substance Abuse & Mental Health Servs. Admin., *Results from the 2012 National Survey on Drug Use and Health*, tbl. 1.38A; U.S. Sentencing Comm'n, *2012 Sourcebook of Federal Sentencing Statistics*, tbl. 34.

[2]*Unfairness in Federal Cocaine Sentencing: Hearing Before Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 50 (2009) (statement of Judge Ricardo H. Hinojosa, Acting Chair, U.S. Sentencing Comm'n).

[3]U.S. Sentencing Comm'n, *Report to the Congress: Cocaine and Federal Sentencing Policy* 11 (2002).

as a result of this law."), and again in 2002 ("[T]o the extent that the 100-to-1 drug quantity ratio is shown to result in unduly severe penalties for most crack cocaine offenders, the impact of that severity falls primarily upon black offenders."), and again in 2007 ("The current severity of crack cocaine penalties mostly impacts minorities.").[4]

There is no question now that the 100-to-1 ratio is unjustified. The Sentencing Commission issued four separate reports telling Congress that the ratio was too high and unjustified because, in part, the "current quantity-based penalties overstate the relative harmfulness of crack cocaine compared to powder cocaine" and the "current severity of crack cocaine penalties mostly impacts minorities."[5] Congress enacted the Fair Sentencing Act in response to these concerns. *See Dorsey*, 132 S. Ct. at 2329. As the Supreme Court described it, Congress "specifically found in the Fair Sentencing Act that [a 100-to-1] sentence was unfairly long." *Id.* at 2333. Other federal actors too recognized that the 100-to-1 ratio is arbitrary. Representative Daniel Lungren, for example, explained the ratio's genesis: "We initially came out of committee with a 20-to-1 ratio. By the time we finished on the floor, it was 100-to-1. We didn't really have an evidentiary basis for it, but that's what we did, thinking we were doing the right thing at the time."[6] In congressional hearings addressing the 100-to-1 ratio, the Department of Justice urged Congress not to "ignore the mounting evidence that the current cocaine sentencing disparity is difficult to justify based on the facts and science."[7] And the U.S. Drug Enforcement Administration's former Administrator testified that "[t]he facts and the passage of time have built a growing consensus that the sentencing disparity is

---

[4]*See* U.S. Sentencing Comm'n, *Special Report to Congress: Cocaine and Federal Sentencing Policy* ch. 7 (1995); U.S. Sentencing Comm'n, *Special Report to Congress: Cocaine and Federal Sentencing Policy* 8 (1997); U.S. Sentencing Comm'n, *Report to the Congress: Cocaine and Federal Sentencing Policy* 103 (2002); U.S. Sentencing Comm'n, *Report to the Congress: Cocaine and Federal Sentencing Policy* 8 (2007).

[5]U.S. Sentencing Comm'n, *Report to the Congress: Cocaine and Federal Sentencing Policy* 8 (2007); *Dorsey v. United States*, 132 S. Ct. 2321, 2328 (2012).

[6]156 Cong. Rec. H6196-01 (2010) (statement of Rep. Lungren).

[7]*Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong. 99 (2009) (statement of U.S. Dep't of Justice through Lanny A. Breuer, Assistant Attorney General).

fundamentally unfair, has a disparate racial impact and undermines the perception of fairness and the integrity of our criminal justice system."[8]

There is no question now that using the 100-to-1 mandatory minimums to deny eligibility for § 3582(c)(2) sentence modifications continues to treat African-American offenders more harshly than White offenders. African Americans not only are overrepresented among those prosecuted and sentenced under the 100-to-1 ratio, they also were more likely to be subject to the 100-to-1 minimums at sentencing. In fiscal year 2010, for example, African Americans composed 79% of those subjected to the crack mandatory minimums.[9] Only 4.4% of that group was White. And the Sentencing Commission estimates that if the 100-to-1 minimums do not prevent § 3582(c)(2) sentence modifications, 88% of inmates eligible for a reduction would be African-American.[10]

Why, then, are African Americans otherwise eligible for sentence modifications still imprisoned by a racially discriminatory, unjustified, repealed law? "Finality," the majority and the government reply. They argue that Congress intended to keep these sentences final.

Judge Rogers's analysis cogently explains that Congress did not, in fact, intend to keep these sentences final when it passed the Fair Sentencing Act. Instead, the Act's 18-to-1 ratio applies retroactively to reduce sentences driven by the 100-to-1 guidelines *and* those driven by the 100-to-1 minimums. But the bigger problem, to my mind, is that this claim of finality cannot withstand even rational basis scrutiny under equal protection principles.

---

[8]*Id.* at 146–47 (statement of Asa Hutchinson).

[9]U.S. Sentencing Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 192 (2011).

[10]*Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences: Hearing Before S. Comm. on the Judiciary*, 113th Cong. (2013) (statement of Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n).

Take those everyone agrees are eligible for § 3582(c)(2) proceedings: crack convicts sentenced above the 100-to-1 minimums. The majority and the government concede that an individual in this category could receive a sentence reduction. *See* Majority Op. at 8. In other words, a district court could hold a hearing and recalculate the inmate's sentence, thereby disrupting its finality and incurring the time and costs of doing so. But then the majority says something odd: a district court still must apply the racially discriminatory, unjustified, repealed minimums to deny a full reduction to the new guidelines, all in the name of finality—finality that *already* has been set aside. This approach is irrational; it does not rationally further finality. Applying the minimums in this way would fail basic rational basis scrutiny. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (equal protection requires that "the classification rationally further a legitimate state interest").

What about using the 100-to-1 minimums to deny eligibility for § 3582(c)(2) altogether? This at least has the appearance of being rationally related to finality by preventing some crack convicts from accessing the statutory mechanism specifically designed to disrupt their sentences. But the appearance proves deceptive upon a closer look.

First, this case calls for a more searching form of review than we apply in the typical rational basis case. This unusual scenario, involving a clear racially disparate impact, Congress's repudiation of the 100-to-1 guidelines and minimums as discriminatory and unjustified, and retroactive application of the 18-to-1 guidelines, gives us reason to be suspicious of a simultaneous effort to deny retroactive application of the 18-to-1 minimums. *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2692 (2013) ("Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to [equal protection principles]."); *see also Romer v. Evans*, 517 U.S. 620, 632–35 (1996); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–38 (1973). As these cases demonstrate, our system of tiered scrutiny need not be unyielding in the face of recognized injustice.

Second, arguing that the Fair Sentencing Act rationally furthers finality makes little sense when the Act itself permits a slew of similarly situated crack offenders to disrupt finality. As of October, in fact, 7,400 crack offenders have received sentence reductions based on retroactive application of the 18-to-1 guidelines.[11] Contrary to the majority's suggestion, Op. at 9–10, Congress clearly gave the Sentencing Commission proper authority to apply retroactively the guidelines changes made in response to the Fair Sentencing Act. 28 U.S.C. § 994(u); *Dillon v. United States*, 130 S. Ct. 2683, 2688 (2010). The Act permits those initially sentenced above the 100-to-1 minimums—the more serious offenders—to intrude on finality. No persuasive justification exists for prohibiting those initially sentenced at the 100-to-1 minimums—the less serious offenders—from doing the same.

Third, § 3582(c)(2) in part already addresses finality interests by restricting relief to offenders whose sentences were based on ranges lowered and made retroactive by the Sentencing Commission, among other limitations. *See* 18 U.S.C. § 3582(c)(2); U.S.S.G. § 1B1.10; 18 U.S.C. § 3553(a).

Finality is easily used as a post-hoc explanation that makes past unjustified discrimination permanent. But these three considerations, taken together, undercut the majority's view of finality as inviolable. The Fair Sentencing Act cannot be said to further finality interests rationally when it permits modification of sentences above, but not at, the racially discriminatory, unjustified, repealed 100-to-1 minimums.

That we have previously rejected equal protection challenges to the 100-to-1 ratio in the § 3582(c)(2) context does not mean we must do so now. Simply put, our knowledge and Congress's knowledge have changed. The ratio disproportionately affects African Americans. The ratio is unjustified. Congress repealed the law because the ratio is unjustified, with full awareness of its discriminatory effects. Using the ratio to deny sentence modifications continues to treat African-American offenders more harshly than White offenders, despite Congress's aim to the contrary. Because of

---

[11]U.S. Sentencing Comm'n, *Preliminary Crack Retroactivity Data Report Fair Sentencing Act* 6 tbl. 3 (Oct. 2013).

Congress's acknowledgment of these problems and its explicit attempt to address them, "constitutional arguments that were unavailing in the past may not be foreclosed in the future." *United States v. Then*, 56 F.3d 464, 467 (2d Cir. 1995) (Calabresi, J., concurring); *see also United States v. Reddrick*, 90 F.3d 1276, 1284 (7th Cir. 1996) (Cudahy, J., concurring) ("The rationality of the 100:1 crack/powder ratio and its implications for equal protection will no doubt be the subject of continuing examination both within the judiciary and without."); *United States v. Smith*, 73 F.3d 1414, 1422 (6th Cir. 1996) (Jones, J., concurring) ("Continued use of the law to perpetuate a result at variance with rationality and common sense—even in a war on drugs—is indefensible.").

I do not argue lightly that what once was rational has been made irrational by changed circumstances. But this is the rare case deserving such treatment. Our court mistakenly paid no heed to Judge Nathaniel Jones years ago in *Smith*, 73 F.3d at 1418. We would be wise to mark his words today: "As judges, we should no longer remain wedded to that which experience shows is neither rational nor fair."

I respectfully dissent.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  The Fair Sentencing Act ("FSA"), Pub. L. No. 111–220, 124 Stat. 2372 (2010), was passed by Congress in 2010 to reinstill some semblance of fairness and equality to a system plagued by inequality and injustice. Under the majority's interpretation of this statute, however, thousands of individuals, predominately African Americans from low-income communities like Cornelius Blewett and Jarreous Blewitt ("the Blewetts"), are foreclosed from obtaining the benefits of the FSA.  Instead, the majority reads the FSA to further the injustice that has existed in the crack cocaine sentencing system for over twenty years.  Under this reading, individuals like the Blewetts will continue to be incarcerated in a disproportionate, unjustified manner, in violation of their rights under the Equal Protection Clause.  Because I disagree with the majority's characterization of the FSA's retroactivity and believe this Court's opinion furthers the injustice that has resulted from such an unequal sentencing regime, I respectfully dissent.

With the Anti-Drug Abuse Act of 1986 ("1986 Drug Act"), Pub. L. No. 99–570, 100 Stat. 3207 (1986), Congress created an unequal sentencing regime designed to punish drug offenders more heavily "depending primarily upon the kind and amount of drugs involved in the[ir] offense." *Dorsey v. United States*, 132 S.Ct. 2321, 2327 (2012). Because this regime established a 100-to-1 sentencing ratio between crack and powder cocaine, a crack cocaine offender possessing five grams of crack with intent to distribute received a five-year mandatory minimum sentence while such a sentence was only applied to a powder cocaine offender in possession of 500 grams of powder cocaine with intent to distribute.  *Id.*  Under this regime, the mean sentence for crack cocaine offenders was 133.4 months, while powder cocaine offenders "receive[d] a mean sentence of approximately [90] months." *United States v. Smith*, 73 F.3d 1414, 1419 (6th Cir. 1996) (Jones, J., concurring) (citing *Sentencings Drop by 2,000*, GUIDE LINES, June 1995 at 4).

Although, at that time, this ratio may have been deemed necessary in some quarters to confront the troubling rise of crack cocaine, the rationale behind such a sentencing disparity has since been debunked and has been abandoned by most of the parties originally in favor of the 1986 statute. 156 CONG. REC. H6202 (daily ed. July 28, 2010) (statement of Rep. Robert C. "Bobby" Scott, Chairman, H. Subcomm. on Crime, Terrorism, Homeland Sec., and Investigations of the H. Comm. on the Judiciary) ("We are not blaming anybody for what happened in 1986, but we have had years of experience and have determined that there is no justification for the 100-to-1 ratio."). *See also* 155 CONG. REC. S10491 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin) ("Vice President Joe Biden, one of the authors of the legislation creating this disparity in sentencing, has said: 'Each of the myths upon which we based the disparity has since been dispelled or altered.'").

In 2010, after years of reports from the United States Sentencing Commission ("Sentencing Commission") and criticism from parties on all sides of the American legal system, including the law enforcement community, Congress finally heeded the loud call for reform by enacting the FSA. Among other things, this statute greatly reduced the ratio for mandatory minimum sentencing between crack and powder cocaine from 100-to-1 to 18-to-1 and instructed the Sentencing Commission to create sentencing guidelines consistent with those new mandatory minimums. *Dorsey*, 132 S.Ct. at 2329. The Sentencing Commission did as instructed by designing sentencing guidelines in tandem with Congress' new mandatory minimums and explicitly making the guidelines retroactive. *Id*. at 2336. Therefore, the FSA replaced the harsh and unjust mandatory minimums and the mandatory minimums led to new sentencing guidelines, which are expected to reduce future sentences for low-level drug offenders and have the potential to mitigate some of the past injustice associated with the 1986 Drug Act.

The Blewetts are two African American drug offenders who received ten-year sentences under the 1986 Drug Act's mandatory minimum for possession of crack cocaine with the intent to distribute. Under the FSA's new sentencing requirements, however, their offenses would not warrant application of the old mandatory minimum

sentences. Therefore, despite being sentenced prior to Congress' enactment of the FSA, the Blewetts sought sentence reductions under the statute's new mandatory minimums. When the district court denied their motions, they appealed their case, bringing an important question before this Court: whether the FSA's new mandatory minimums, which were designed to avoid the disparities and inequality associated with the old 100-to-1 regime, should apply retroactively to individuals like the Blewetts, who were sentenced prior to the FSA's enactment.

While the majority adopts the government's position that Congress did not intend for these mandatory minimums to be applied retroactively to individuals already sentenced and serving out their time under the 1986 Drug Act, the constitutional guarantees of equal protection compel a contrary reading–that the mandatory minimums designed by Congress to remedy past injustices are retroactive and provide relief to individuals like the Blewetts.

We do not purport to devise a procedural mechanism for implementing the retroactive application of the FSA. Although the other separate opinions in this case attempt to address that issue, and the matter of whether the availability of § 3582(c)(2) may be a viable approach, the objective of this opinion is limited to addressing the issue of whether a failure to grant retroactivity constitutes an equal protection violation under circumstances where untold thousands of individuals remain imprisoned under old mandatory minimum sentences pursuant to a sentencing regime rife with inequities and discrimination.

I.    **The 100-to-1 Ratio is Unsupported by Penological or Pharmacological Interests**

Each of the justifications originally presented in support of the 1986 Drug Act's disparity between crack and powder cocaine sentencing has since been debunked.[1] The

_____

[1] As the Honorable Reggie B. Walton, United States District Judge for the District of Columbia, described in his statement before the Senate Committee on the Judiciary, he originally "advocated in support of disparity between crack and powder because [he], too, thought, based upon the information available [] at the time, that disparity at least on some level was appropriate." However, he no longer supports the disparity and instead, recognizes that there is no evidentiary support for its further application. *Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the*

original disparity was justified by what appeared to be an important pharmacological difference between crack and powder cocaine as well as a fear of greater violence surrounding dealings and use of crack cocaine versus powder cocaine. USSC, SPECIAL REPORT TO CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 8 (May 2007) (2007 Report) [hereinafter COCAINE AND FEDERAL SENTENCING POLICY (May 2007)]. However, as Republican Representative, Daniel Lungren, stated in support of the FSA, "We initially came out of committee with a 20-to-1 ratio. By the time we finished on the floor, it was 100-to-1. We didn't really have an evidentiary basis for it, but that's what we did, thinking we were doing the right thing at the time." 156 CONG. REC. H6202 (daily ed. July 28, 2010) (statement of Rep. Lungren). Mr. Elmore Briggs, Director of Clinical Services at the District of Columbia Department of Health, Addiction, Recovery, and Prevention Administration, has concluded that despite differences in mechanisms for delivery of crack and powder cocaine into the body, "trafficking sentencing should be equalized for cocaine regardless of the form of drug." COCAINE AND FEDERAL SENTENCING POLICY, at B-10 (May 2007).[2] In a 2002 statement submitted to the Sentencing Commission, 28 former United States Attorneys serving as United States Circuit Court of Appeals and District Court judges stated "that the 'current disparity between powder cocaine and crack cocaine, in both the mandatory minimum statutes and the guidelines, cannot be justified and results in sentences that are unjust and do not serve society's interest.'" USSC, REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 2 (May 2002) (2002 Report). Members of Congress have similarly acknowledged that there is no pharmacological basis for the large disparity in sentencing between crack and powder cocaine. For example, during a 2009 Senate

---

*S. Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong. 7 (2009) (statement of the Honorable Reggie B. Walton, United States District Judge for the District of Columbia).

[2]Dr. Nora Volkow, Director of the National Institute on Drug Abuse, also testified before the Sentencing Commission that "all forms of cocaine, regardless of the route of administration, result in a similar blockage of dopamine transporters . . . which is why repeated use of any form of cocaine can lead to addiction and other health consequences." Despite acknowledging that route of administration can cause different effects in the body, "she emphasized that the excess risk [of addiction] is not attributable to crack cocaine smoking or injecting [powder] cocaine." COCAINE AND FEDERAL SENTENCING POLICY, at B-10–B-11 (May 2007). Similarly, Dr. Harolyn Belcher, Associate Professor of Pediatrics at Johns Hopkins University School of Medicine, stated in a report to Congress that although "the rate of drug distribution varies depending on the method of administration, [] the fetal effects of crack cocaine and powder cocaine, once they pass through the placenta, should be identical." *Id.* at B-12.

hearing considering adoption of the FSA, Senator Dick Durbin recalled that he and fellow members of Congress irrationally feared crack cocaine in the mid-to-late 1980s as it "had just appeared on the scene and it scared us, because it was cheap and it was addictive. We thought it was more dangerous than many narcotics and left the legacy of crack babies and broken lives." 156 Cong. Rec. S1680 (daily ed. March 17, 2010) (statement of Sen. Durbin). However, he stood before the Senate in 2010 requesting unanimous approval of the FSA, which would rescind the old mandatory minimums enacted in 1986 as a response to the advent of crack cocaine and the fear associated with the new drug and "immediately ensure that every year, thousands of people are treated more fairly in our criminal justice system." *Id*. at S1681.

Additionally, members of Congress and the legal and criminal justice communities, including the "bipartisan U.S. Sentencing Commission, the Judicial Conference of the United States, the National District Attorneys Association, the National Association of Police Organizations, the Federal Law Enforcement Officers Association, the International Union of Police Associations, and dozens of former Federal judges and prosecutors . . ." have recognized that there is no penological evidence supporting the continued application of the old mandatory minimums that created such huge disparities in sentencing. 156 Cong. Rec. H6203 (daily ed. July 28, 2010) (statement of Rep. Hoyer). The Honorable Reggie B. Walton, United States District Judge for the District of Columbia, testified before the Senate Subcommittee on Crime and Drugs that "[he saw] no greater level of violence in reference to the cases that c[a]me before [him] involving crack cocaine as compared to any other drug." *Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the S. Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong. 7 (April 29, 2009) [hereinafter *Restoring Fairness to Federal Sentencing*] (statement of the Honorable Reggie B. Walton, United States District Judge for the District of Columbia). The penological interests that once motivated the large disparity in crack and powder cocaine sentencing can no longer justify such harsh sentences. Dr. Alfred Blumstein, Professor of Urban System and Operations Research at Carnegie Mellon University, testified before the Sentencing Commission that "the maturation and

stabilization of the crack cocaine market has had an important effect in reducing the level of violence," indicating that the fears of greater violence surrounding crack cocaine are no longer based in fact. COCAINE AND FEDERAL SENTENCING POLICY, at B-13 (May 2007).[3] Dr. Bruce Johnson, Director of the Institute for Special Populations Research at the National Development and Research Institutes echoed this perspective when he suggested replacing the 100-to-1 drug quantity ratio with either a 10-to-1 or a 2-to-1 drug quantity ratio to more appropriately capture the respective safety concerns surrounding crack and powder cocaine. *Id*. at B-15.

## II.     Racial Disparities in Sentencing

Even more disconcerting than the lack of evidence to support the great disparity in cocaine offense sentencing is the disparate impact such sentences have had on low-income, African American communities. Representative Bobby Scott, speaking on the floor of the House of Representatives, stated that "[the] disparity is particularly egregious when you consider that the Sentencing Commission has concluded that there is no pharmacological difference between the two forms of cocaine, and that 80 percent of the crack defendants are black, whereas only 30 percent of the powder cocaine defendants are black." 156 CONG. REC. H6197 (daily ed. July 28, 2010) (statement of Rep. Scott). Representatives Sheila Jackson Lee and Steny Hoyer also highlighted the disproportionate impact of the crack-powder disparities on low-income communities of color. *Id*. at H6199 (statement of Rep. Jackson Lee) ("I will say to you that this fell heavily on the poor African American and Hispanic communities."); *id*. at H6203 (statement of Rep. Hoyer) ("It has long been clear that 100-to-1 disparity has had a racial dimension as well, helping to fill our prisons with African Americans disproportionately put behind bars for longer.").

---

[3]Dr. Blumstein also "pointed out that one of the attractive features of the federal sentencing guidelines is the ability to increase basic [] sentences for aggravating features . . . such as carrying a gun or using a gun. This opportunity, according to Dr. Blumstein, obviates the need to differentiate between powder cocaine and crack cocaine in the drug guideline . . . ." COCAINE AND FEDERAL SENTENCING POLICY, at B-14 (May 2007).

Dr. Peter Reuter, Professor in the School of Public Policy and the Department of Criminology at the University of Maryland, confirmed the disparate impact on African Americans when he testified that "the disparity in sentences produced a tragic disproportion in the share of crack cocaine prison time served by African Americans." COCAINE AND FEDERAL SENTENCING POLICY, at B-16 (May 2007). In 1993, although the majority of crack cocaine users were white, "[b]lack defendants accounted for 88 percent of all federal convictions for crack distribution . . . ." Stuart Taylor, Jr., *Courage, Cowardice on Drug Sentencing*, LEGAL TIMES (April 24, 1995). Therefore, under the 100-to-1 regime, which requires a sentence three to eight times longer for crack than for powder cocaine, the sentences for African Americans tended to be far longer on average than sentences for white powder cocaine offenders. As Senator Durbin stated before the Senate,

> Disproportionately, African Americans who are addicted use crack cocaine. The use of powder cocaine is spread across the population among Whites, Hispanics, and others. So the net result of this was that the heavy sentencing we enacted years ago took its toll primarily in the African-American community. It resulted in the incarceration of thousands of people because of this heavy sentencing disparity and a belief in the African-American community that it was fundamentally unfair. It was the same cocaine, though in a different form, and they were being singled out for more severe and heavy sentences.

156 CONG. REC. S1680–81 (daily ed. March 17, 2010) (statement of Sen. Durbin).

Members of Congress were emphatic in suggesting that these racial disparities in cocaine sentencing produced equal protection problems. Representative Ron Paul stated on the floor of the House of Representatives that "[the FSA] makes an attempt to correct a very, very serious problem in equal justice in our systems . . . ." 156 CONG. REC. H6203 (daily ed. July 28, 2010) (statement of Rep. Paul). Senator Patrick Leahy also stated that "[t]he racial imbalance that has resulted from the cocaine sentencing disparity disparages the Constitution's promise of equal treatment for all Americans . . . . [The FSA] reduces the disparities that leave some in jail for years while their more privileged counterparts go home after relatively brief sentences." 156 CONG. REC. S1682 (daily ed. Mar. 17, 2010) (statement of Sen. Leahy, Chairman, S. Comm. on the

Judiciary).  The racial disparities inherent in the old sentencing regime create an equal protection issue and a human rights issue, which could be resolved by retroactive application of the FSA's new sentencing ratio.  *Restoring Fairness to Federal Sentencing*, at 3 (statement of Sen. Durbin, Chairman, S. Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary) ("Our record-high incarceration rates and the racial disparities in our criminal justice system are human rights issues that we must face honestly.").

## III.     Equal Protection Analysis

The Equal Protection Clause stipulates that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws" and these protections apply equally against acts of state governments and the federal government.  U.S. CONST. amend. XIV, § 1; *Bowling v. Sharpe*, 347 U.S. 497, 500 (1954); *United States v. Paradise*, 480 U.S. 149, 166 n.16 (1987) (plurality opinion).  Under these equal protection principles, "'all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.'" *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008) (quoting *Hayes v. Missouri*, 120 U.S. 68, 71–72 (1887)).

The concerns leading to the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments are particularly relevant in the context of legislation that draws distinctions based on race and disproportionately impacts African Americans. *Bell v. Maryland*, 378 U.S. 226, 289 (1964) (Goldberg, J., concurring).  At the heart of equal protection is an intent to eradicate racial disparity in treatment under the law.  "Such opinions immediately following the adoption of the Amendments clearly reflect the contemporary understanding that they were 'to secure to the colored race, thereby invested with the rights, privileges, and responsibilities of citizenship, the enjoyment of all the civil rights that, under the law, are enjoyed by white persons . . . .'" *Id.* (quoting *Neal v. Delaware*, 103 U.S. 370, 386 (1880)).

Although the FSA is not facially discriminatory, an interpretation of the FSA foreclosing the retroactive application of its new mandatory minimums would present

an equal protection problem inasmuch as it would subject a group that is overwhelmingly predominately African American to starkly different treatment under the law.  Such an interpretation can meet neither strict scrutiny nor rational basis review and should therefore be avoided by this Court.

### A.     Strict Scrutiny

Although the FSA is neutral on its face and a decision regarding the retroactivity of the mandatory minimums would also be facially neutral, the majority's interpretation of the FSA's retroactivity poses serious constitutional concerns.  A law presents an equal protection violation and must therefore be struck down or read differently if it is motivated by a racially discriminatory purpose and has a disparate impact on an identifiable group.  *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980).  The Supreme Court explained in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.* that "[t]he impact of the official action whether it 'bears more heavily on one race than another,' may provide an important starting point.  Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

The 100-to-1 ratio under the 1986 Drug Act clearly disproportionately impacts African Americans without any evidentiary basis in science or criminal justice theory.  In 1993, for example, black and Hispanic individuals accounted for over 95% of the offenders who were convicted for crack distribution. *United States v. Then*, 56 F.3d 464, 467 (2d Cir. 1995) (Calabresi, J., concurring) (citing USSC, SPECIAL REPORT TO CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 192 (Feb. 1995) (1995 Report)).  Although the proportion of crack cocaine offenders who are African American has declined since 1992, the proportion still remained at 81.8% of the total crack cocaine offender population in 2006.  COCAINE AND FEDERAL SENTENCING POLICY, at 15 (May 2007).  In 2010, Congress acted, in large part, to rectify this injustice and to equalize the crack and powder cocaine sentencing regime that had been criticized on all fronts.  In fact, "African Americans serve almost as much time in Federal prison for a drug offense

(58.7 months) as whites do for a violent offense (61.7 months), largely due to sentencing laws such as the 100-to-1 crack-powder cocaine disparity." H.R. REP. NO. 111-670, at 4 (2010).

Of course, this information was known to Congress prior to the FSA's enactment. In fact, on a number of occasions, this Court and other circuits considered this information and ultimately held that the disparities in sentencing alone were not sufficient to amount to an equal protection violation. *See, e.g., United States v. Blair*, 214 F.3d 690, 702 (6th Cir. 2000); *United States v. Burgos*, 94 F.3d 849, 876 (4th Cir. 1996).[4]    However, the legislative enactment of the FSA rendered the old case law obsolete. As early as 1995, it appeared that viable constitutional arguments might arise in the future to challenge the inequality inherent in the 100-to-1 disparity. *Then*, 56 F.3d at 467 (Calabresi, J., concurring). In his concurring opinion in *Then*, Judge Calabresi recognized that the disproportionate sentencing ratio was seemingly justified at the time it was adopted, and "the link between foreseeable discriminatory impact and motive was insufficient to establish the kind of discriminatory intent on the part of Congress or the Commission that is needed to support [an] equal protection claim." *Id*. However, he also suggested that "what is known today about the effects of crack and cocaine, and about the impact that the crack/cocaine sentencing rules have on minority groups, is significantly different from what was known when the 100-to-1 ratio was adopted." *Id*. *See also Smith*, 73 F.3d at 1419–1421 (Jones, J., concurring). Therefore, Judge Calabresi opined that

> [i]f Congress . . . though it was made aware of both the dramatically disparate impact among minority groups of enhanced crack penalties and of the limited evidence supporting such enhanced penalties, were nevertheless to act affirmatively and negate the Commission's proposed amendments to the Sentencing Guidelines (or perhaps were even just to allow the 100-to-1 ratio to persist in mandatory minimum sentences), subsequent equal protection challenges based on claims of discriminatory

---

[4] Judge Sutton's opinion cites these two cases as well as an overly cumulative list of other cases for the proposition that this constitutional question has already been answered. However, all of these cases were decided before Congress acted to ameliorate the equal protection problems inherent in the 1986 Drug Act. Judge Sutton fails to present a single case decided since the FSA's enactment that precludes such an equal protection argument.

purpose might well lie . . . . As the Supreme Court has pointed out, facially-neutral legislation violates equal protection if there is evidence that the legislature has "selected *or reaffirmed* a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

*Then*, 56 F.3d at 468 (Calabresi, J., concurring) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

To interpret this statute in a manner that does not extend this equalizing mechanism to the thousands of individuals sentenced under the old mandatory minimums would create a "clear pattern, unexplainable on grounds other than race . . . ." *Arlington Heights*, 429 U.S. at 266. In fact, such a reading of the FSA creates the exact equal protection concerns raised by Judges Calabresi and Jones in their respective concurring opinions. *Then*, 56 F.3d at 467 *(*Calabresi, J., concurring); *Smith*, 73 F.3d at 1422 (J. Jones, concurring). Adopting new mandatory minimums for the purpose of righting the racially discriminatory wrongs of the past and not extending the benefits of the new enactment to the thousands of predominately African American individuals serving disproportionate sentences under a now-rejected statue violates equal protection because Congress has recognized and reaffirmed "its adverse effects" upon the African American community. *Feeney*, 442 U.S. at 279.

The constitutional avoidance principle demands that we interpret a statute in a way that avoids any violation of the Constitution. "It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity." *U.S. ex rel. Attorney Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 407 (1909) (citing *Knights Templars' & M. Life Indem. Co. v. Jarman*, 187 U.S. 197, 205 (1902)). Therefore, we must interpret the FSA's new mandatory minimums to apply retroactively; otherwise, thousands of incarcerated individuals, most of whom are impoverished African Americans, will remain incarcerated under unequal, unjust, and unconstitutional prison sentences. Had Congress intended the new mandatory minimums to be only

prospective, then Congress would have reaffirmed the inequalities that have now been acknowledged as lacking in any evidentiary basis and creating deep racial disparities. The majority's reading of the FSA would assign to Congress an improper discriminatory purpose, which must be avoided under the Constitutional avoidance doctrine.[5] *Then*, 56 F.3d at 468 (Calabresi, J., concurring); Brief for NAACP Legal Defense and Educational Fund as Amicus Curiae at 14. Such a reading would ensure the continued disproportionate incarceration of young African American crack cocaine offenders and would "send a message to the public that 'the lives of white criminals are considered by the U.S. justice system to be at least 100 times more valuable and worthy of preservation than those of black criminals [sentenced prior to the FSA's enactment].'" *Smith*, 73 F.3d at 1422 (Jones, J., concurring) (quoting Keith Owens, *Crack in the System: Bias in Drug Laws Sends More Blacks to Jail*, THE DALLAS MORNING NEWS, October 25, 1995, at A27).

**B.     Rational Basis Review**

On the other hand, even absent Congressional discriminatory intent, the FSA's mandatory minimums must still be interpreted to apply retroactively under rational basis review. Where the government's action "neither burdens a fundamental right nor targets a suspect class, [this Court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Under rational basis review, any "classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Johnson v. Robison*, 415 U.S. 361, 374–75 (1974) (quoting *Royster Guano Co.*

---

[5] According to Judge Sutton's opinion, to demonstrate an equal protection violation based on a disparate impact theory, we must find that the same Congress responsible for addressing the racial inequality in cocaine sentencing was also "racist" with respect to the FSA's retroactivity. To the contrary, Congress' lack of clear expression on the issue can be interpreted in at least two different ways: either Congress chose to apply the new mandatory minimums retroactively, finally rectifying a racial disparity that is unsupported by any penological or pharmacological justification, or Congress deliberately chose to deny relief to those individuals currently incarcerated under what is now recognized as an unjust, unequal, and unconstitutional sentencing scheme. The constitutional avoidance principle requires us to adopt the former interpretation and interpret Congress' lack of explicitness in harmony with its intent to diminish the racial disparity in crack and powder cocaine sentencing.

*v. Virginia*, 253 U.S. 412, 415 (1920)). "The concept of equal justice under law requires the State to govern impartially. The sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." *Lehr v. Robertson*, 463 U.S. 248, 265 (1983) (internal citation omitted).

Under the rational basis test, a petitioner generally carries a heavy burden to show that a statute is arbitrary and unsupported by any rational basis. *Lindsley v. Nat'l Carbonic Gas Co.*, 220 U.S. 61, 78–79 (1911); *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). "[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). This principle, however, has broken down when "[a] protesting group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Massachusetts v. U.S. Dept. of Health & Human Servs.*, 682 F.3d 1, 10 (1st Cir. 2012). While courts are generally deferential to government enactments that neither burden fundamental rights nor make suspect classifications, they are more rigorous in their review under certain circumstances. *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 691–92 (6th Cir. 2011). The Supreme Court has applied this more rigid version of rational basis review to strike down group classifications that are not traditionally entitled to heightened scrutiny. *See, e.g., Cleburne*, 473 U.S. at 447–50 (applying a more rigorous rational basis review to a zoning law impacting the mentally retarded); *Romer*, 517 U.S. at 631–35 (applying a heightened rational basis standard to a classification subjecting gays and lesbians to different treatment). *See also Am. Express*, 641 F.3d at 691–92 (citing *Burstyn v. City of Miami Beach*, 663 F.Supp. 528, 536–37 (S.D. Fla. 1987), in which the district court applied a more stringent rational basis review to discrimination against the elderly). In each of these cases, the courts "stressed the historic patterns of disadvantage suffered by the group adversely affected by the statute . . . [entitling them to] a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review." *Mass. v. H.H.S.*, 682 F.3d at 11.

Congress has made a distinction between crack cocaine offenders and powder cocaine offenders, the former being overwhelmingly impoverished African Americans. There may be no more abject, disparaged, powerless minority group than those sentenced under the old crack cocaine mandatory minimums. This is where the democratic process breaks down and traditional rational basis review is insufficient to protect the group of individuals convicted under federal crack cocaine mandatory minimums, more than 82% of whom were African American in 2005. USSC, 2005 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, Table 34 (2006). Courts should not be as deferential to government enactments under circumstances where an irrational classification based on the *form* of cocaine, which has real-world consequences in terms of sentencing disparities, tracks so closely with race.

The State cannot proffer any legitimate penological or pharmacological reason for the continued incarceration of those who were subjected to extended sentences under the unjust 100-to-1 ratio. Instead, in the face of this more rigorous rational basis standard, the government can only offer *finality* as its legitimate interest in support of the continued application of the old mandatory minimums. Although finality has previously been recognized as a legitimate state interest, *Penry v. Lynaugh*, 492 U.S. 302 (1989), no one has cited a single case that says finality can support criminal convictions and overly onerous sentences based upon a premise that Congress has overwhelmingly and demonstrably acknowledged to be false as of the day it was passed. This crack versus powder cocaine sentencing scheme has institutionalized young black men at a rate entirely disproportionate to the facts on the ground. Although there may be a societal interest in the finality of criminal sentences under normal circumstances, "'[t]here is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose.'" *Penry*, 492 U.S. at 330 (quoting *Mackey v. United States*, 401 U.S. 667, 693 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)). Here, where Congress is silent on the retroactive application of mandatory minimums, finality cannot serve as a legitimate interest in the face of such abhorrent inequality.

Because thousands of individuals like the Blewetts remain incarcerated under a discriminatory sentencing regime that is unsupported by penological or pharmacological evidence and does not pass constitutional muster, the new mandatory minimums established by the FSA should be deemed to be retroactive. Failure to do so would defeat Congress' clearly expressed intent to ameliorate the equal protection violation of the 1986 Drug Act.

In other words, a judicial determination that the FSA should apply retroactively would comport with Congress' legislative objectives, as substantiated by the statute's legislative history, and would permit the statute to be construed in a manner that satisfies rather than violates the requirements of the Constitution's Equal Protection Clause.

————————————

**DISSENT**

————————————

ROGERS, Circuit Judge, dissenting. We should not interpret the Fair Sentencing Act to create an anomaly unless the words of the statute compel it. They do not.

The Supreme Court in *Dorsey* held that the presumption created by the saving statute—that statutory decreases in sentences do not apply to pre-amendment conduct—was overcome, and did so by evaluating six interpretive factors. *Dorsey v. United States*, 132 S. Ct. 2321, 2331–35 (2012). The particular conclusion that the Court came to was that the sentencing court should apply the statutory minimums in effect at the time of sentencing, not those in effect at the time of the criminal conduct. *Id.* at 2335–36. Stated more generally, Congress wanted the new minimums to apply whenever, after the statutory effective date, the sentence had to be calculated by the trial court. In that sense, *Dorsey* supports the idea that, when a post-Fair Sentencing Act sentence is properly calculated under § 3582(c)(2) because a guideline has been retroactively changed, the new statutory minimums should be applied as well. In other words, when a post-Fair Sentencing Act sentencing court properly has before it the calculation of a sentence, the court should use the Fair Sentencing Act minimums.

The result of the majority's analysis is, in contrast, entirely anomalous. This is not the simple anomaly created by giving Fair Sentencing Act relief to criminals whose guideline range is far above the applicable statutory minimum, but not giving any relief to the less culpable criminals whose guideline range is affected by the minimum (although that discrepancy is unfortunate enough). The anomaly instead is that Congress directed the Sentencing Commission to promulgate sentencing guidelines incorporating the 18-1 ratio, and authorized the Commission to make the guidelines changes retroactive, such that the changed ratio would apply retroactively to all sentenced criminals when their sentence resulted from a guideline, but somehow did not want the 18-1 ratio to apply retroactively if incorporated in a statutory minimum, even though the sentencing minimums were changed for post-enactment sentencing.

The issue thus is not whether the Fair Sentencing Act applies the 18-1 ratio retroactively so as to open the prison doors. The Fair Sentencing Act clearly provides for this when the 18-1 ratio is implemented through a guideline rather than through a statutory minimum. The question in this case is whether the Fair Sentencing Act contemplates retroactivity when it provides for the 18-1 ratio through a guideline, but does not contemplate retroactivity when it provides for the 18-1 ratio through a revised statutory minimum. There is no coherent rationale for this distinction. It is an anomaly.

Each of the interpretative foundations for the *Dorsey* Court's analysis applies by analogy to the application of the 18-1 statutory minimums under § 3582(c)(2). First, "*the 1871 saving statute permits Congress to apply a new Act's more lenient penalties to pre-Act offenders without expressly saying so in the new Act.*" *Dorsey*, 132 S. Ct. at 2331 (italics in original). As the Supreme Court instructs in *Dorsey*, in order to apply the Fair Sentencing Act to a new set of pre-Act offenders, we are to "assure ourselves that ordinary interpretive considerations point clearly in that direction." *Id.* at 2332. They did in *Dorsey*, and they do here.

Indeed, in light of *Dorsey*, it is not logical to rely on the saving statute's default rule in this case. The default rule of that statute applies under neither the majority's analysis nor ours. Under the majority's analysis, the 18-1 statutory minimums apply to defendants sentenced after the effective date, but not to § 3582 proceedings initiated after the effective date. Under our dissenting analysis, the 18-1 statutory minimums apply to sentencing after the effective date and to § 3582 proceedings properly brought after the effective date. Under *neither* analysis does the applicability of the 18-1 statutory minimums depend on when the offense was committed—the default rule created by the saving statute. In other words, there are three possible relevant times for applying the 18-1 statutory minimums: (A) the time of the offense, (B) the time of sentencing, or (C) the time of sentencing or the time of a properly brought § 3582 motion. It makes no sense to say that because (A) is the default under the saving statute, (B) rather than (C) is the law. This questionably-based assumption, however, is the

cornerstone of the other arguments for the anomalous interpretation of the applicability of the Fair Sentencing Act.  Without it, such arguments essentially collapse.

*Second*, Congress created a background principle of retroactivity by enacting § 3582(c)(2).  For the *Dorsey* Court, the fact that the Sentencing Reform Act instructed judges to consider the guidelines that were "in effect on the date the defendant is sentenced" weighed in favor of applying the 18-1 ratio to all defendants that were sentenced post-enactment.  *Dorsey*, 132 S. Ct. at 2332–33; 18 U.S.C. § 3553(a)(4)(ii).  Congress also enacted the Fair Sentencing Act against the backdrop of § 3582—a statute that permits retroactive modification of sentences after the Sentencing Commission amends guideline ranges downward.  Congress' grant of the power to make guideline amendments retroactive to the Commission in 28 U.S.C. § 994(u) shaped the enactment of the Fair Sentencing Act because Congress knew that the Fair Sentencing Act's enactment would lead to modification proceedings under § 3582(c)(2).  Congress can hardly have intended to give retroactive reductions of sentences with one hand, but to take that relief away with the other when it simultaneously amended the very statutory minimums that the majority says limit the Blewetts' access to relief under § 3582(c)(2).

*Third*, the text of the Fair Sentencing Act granted emergency authority to the Sentencing Commission to "make such conforming amendments to the . . . guidelines . . . to achieve consistency with other guideline provisions and applicable law."  Fair Sentencing Act of 2010, Pub. L. 111-220, §8(2), 124 Stat. 2372, 2374.  As the *Dorsey* Court explained, "achieving consistency with 'other guideline provisions' means reducing the base offense levels for all crack amounts proportionally (using the new 18-to-1 ratio)." *Dorsey*, 132 S. Ct. at 2333.  In *Dorsey*, it would have been illogical for Congress to tell the Commission to make the guidelines more lenient, but to defeat the effect of that change by keeping the 100-1 minimums in effect just because Dorsey's conduct occurred pre-enactment. The same logic would apply just as strongly, if not more strongly, to offenders who committed their offense prior to the new amendments' effective date, but whose sentence was thereafter subject to the § 3582 process for retroactive reduction of a sentence.  The Commission could not, consistent with its

power to make the guidelines retroactive through § 3582, allow proportional reductions in sentences based on the new 18-1 ratio if the 100-1 minimums continue to apply. (Of course if the Fair Sentencing Act had explicitly provided for nonretroactivity for the amended statutory minimums, as in the majority's "second roadblock" example, this factor would certainly weigh differently.)

*Fourth*, for the *Dorsey* Court, reading the Fair Sentencing Act as "imposing upon the pre-Act offender a pre-Act sentence after Congress had specifically found in the Fair Sentencing Act that such a sentence was unfairly long" created disparities of the kind the Fair Sentencing Act was enacted to prevent. *Dorsey*, 132 S. Ct. at 2333. Similar disparities result from not giving retroactive relief to an offender who committed the crime and was convicted and sentenced promptly, and one for whom delay in arrest, conviction, or sentencing pushed the sentencing beyond the effective date of the Fair Sentencing Act.

*Fifth*, not permitting the § 3582 procedure to apply "makes matters worse," in the words of the *Dorsey* Court's fifth consideration, by giving retroactive relief only to those whose actions put them in guideline ranges higher than the mandatory minimums—i.e., the worse criminals. The purpose of the Act— "restor[ing] fairness to Federal cocaine sentencing"— is hardly served by granting relief only to the more culpable criminals. The crazy-quilt nature of the majority's interpretation is first shown by a variation of the example used by the *Dorsey* Court to illustrate unwarranted disparities. In the Court's hypothetical, Smith and Jones were both convicted of possessing crack with intent to distribute. Smith was caught with four grams and Jones with five. Changing the hypothetical to apply to the facts of this case, assume that both Smith and Jones were sentenced before the enactment of the Fair Sentencing Act. Smith's base offense level would be 22 and, assuming a criminal history of I, Smith would receive a range of 41–51 months. Since Jones had five grams, his base offense level would be 24 with a sentencing range of 51–63 months. But since Jones' offense involved five grams, he would also be subject to the pre-Fair Sentencing Act mandatory minimum of five years. 21 U.S.C. § 841(b)(1)(B)(iii). Now imagine that both Smith and Jones move for a

sentence modification after the Fair Sentencing Act's enactment.  Under the 18-1 drug quantity table, both Smith and Jones would have base offense levels of 16 and therefore sentencing ranges of 21–27 months.  But under the majority's view, only Smith would be entitled to a modification, i.e, Smith's sentence could be modified to as few as 21 months, but Jones' sentence would remain at 60 months.  A situation where one defendant's sentence is more than twice as long as a similarly situated individual's is precisely the kind of "disparate sentencing cliff" that concerned the *Dorsey* Court and that the sentencing guidelines are supposed to avoid.  Congress unquestionably recognized this by directing the Commission to enact Guidelines that avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  28 U.S.C. § 991(b)(1)(B).

The majority's interpretation "makes matters worse" if the *Dorsey* Court's hypothetical is further modified to assume that a third individual, Johnson, is sentenced the same day as Smith and Jones.  Johnson's situation is identical, except that his crime involved five *kilograms* of crack.  Under the 100-1 guidelines, Johnson would receive a base offense level of 38 and with a criminal history of I, a sentencing range of 235–293, well above the applicable 10-year mandatory minimum.  Johnson's amended 18-1 range would be 188–235, making him eligible for a modification under § 3582.  The availability of retroactive application of the Guidelines for Johnson, but not for Jones is another example of a sentencing disparity like the ones that concerned the *Dorsey* Court because it would provide retroactive fairness only for the more culpable offenders.

*Sixth*, in holding that the 18-1 minimums did apply to pre-enactment conduct, the *Dorsey* Court recognized that "the application of the new minimums to pre-Act offenders sentenced after August 3 will create a new set of disparities.  But those disparities, reflecting a line-drawing effort, will exist whenever Congress enacts a new law changing sentences (unless Congress intends re-opening sentencing proceedings concluded prior to a law's effective date)."  *Dorsey*, 132 S. Ct. at 2335.  This statement provides the strongest support for the majority's result, but it is only dictum in the

context of a case that in no respect involved a § 3582 sentence modification. That the Court held the saving statute to be trumped notwithstanding the possibility of remaining sentencing disparities—without ruling on whether such disparities remained—does not compel the conclusion that the disparities remain. The Supreme Court did not have that case before it. Thus, the interpretive factors used by the *Dorsey* Court indicate that the 18-1 minimums should apply retroactively in a § 3582 proceeding.

It may be that the Supreme Court Justices and litigants in *Dorsey* assumed that the 18-1 minimums could not be applied whenever sentencing occurred prior to the Fair Sentencing Act's passage. But assumptions are not law. Likewise the holdings of other circuits,[1] and of our prior three-judge panels, are not binding, however persuasive they may or may not be. The plain fact is that the language of the Fair Sentencing Act does not require the anomaly that the 18-1 ratio applies retroactively to reduce guideline-driven sentences but not mandatory minimum-driven sentences, when both the guidelines and the minimums were reduced by the Fair Sentencing Act.

Section 3582(c)(2) permits a modification when a defendant "has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . if such reduction is consistent with applicable policy statements issued by the Sentencing Commission." It is true that the statute, which was of course passed before the Fair Sentencing Act, does not refer to reduced statutory minimums. But it does refer to guidelines reduced by the Commission, and the Blewetts have reduced sentencing ranges because of the Commission's changes to the § 2D1.1 drug quantity table. It is also true that the words can be parsed not to apply to mandatory minimum-driven sentences, on the theory that a reduction of the

---

[1] The views of our sister circuits may not be as consistently contrary as the majority suggests. The cases cited from the First, Second, Third, and Fourth Circuits are either pre-*Dorsey* or do not involve § 3582. *See United States v. Santos-Rivera*, 726 F.3d 17, 28 n.2 (1st Cir. 2013) (direct appeal); *United States v. Diaz*, 627 F.3d 930, 931 (2d Cir. 2010) (pre-*Dorsey*); *United States v. Turlington*, 696 F.3d 425, 426 (3d Cir. 2012) (proceeding under § 3583(e)(3)); *United States v. Mouzone*, 687 F.3d 207, 222 (4th Cir. 2012) (direct appeal). Further, the cases cited from the Fifth, Seventh, and Tenth circuits reject an argument that a § 3582 proceeding is a resentencing and so therefore *Dorsey* applies, an argument that is much weaker than the one advanced by the Blewetts here because it is clearly precluded by *Dillon v. United States*, 130 S. Ct. 2683 (2010). *See United States v. Kelly*, 716 F.3d 180, 181 (5th Cir. 2013); *United States v. Foster*, 706 F.3d 887, 888 (7th Cir. 2013); *United States v. Lucero*, 713 F.3d 1024, 1028 (10th Cir. 2013).

sentence was not "based on" a reduced guideline.  But the language can just as well be read to say that, for purposes of the later-enacted Fair Sentencing Act, § 3582 applies where a guideline, even one restricted by a statutory minimum, is reduced.  In that sense, the sentences in the Blewetts' cases were based on since-reduced guidelines.  In short, the words "based on" need not have the identical meaning in every context, and should not be restrictively construed to prevent what otherwise is a result fairly compelled by applying a *Dorsey* analysis to the question of how § 3582 applies to the Fair Sentencing Act.[2]

The requirement that the sentence reduction be consistent with the policy statement found at U.S.S.G. § 1B1.10 is also met.  To be consistent with the policy statement, the guideline range applicable to the Blewetts must have been lowered by an amendment listed at 1B1.10(c).  Subsection (c) includes parts A and C of Amendment 750, which made the current, 18-1 drug quantity table found in § 2D1.1 permanent.  That the Blewetts' sentencing ranges were reduced by this amendment is not controverted.  What is contested is the fact that the policy statement provides that: "A reduction in the defendant's term of imprisonment is not consistent with this policy statement and therefore is not authorized under 18 U.S.C. § 3582(c)(2) if . . . an amendment listed in subsection (c) does not have the effect of lowering the defendant's applicable guideline range."  § 1B1.10(a)(2)(B).  The guidelines' commentary explains that one situation where an amendment may not have the effect of lowering an applicable guideline range would be because of the operation of a statutory minimum.  *Id.* cmt. 1(A).  This language is only a problem if one assumes that Amendment 750 would have no effect on the Blewetts' sentences because they would still be subject to a ten-year sentence because of the 100-1 mandatory minimums.  But that argument is premised on the earlier conclusion that Congress did not intend for the Fair Sentencing Act to make the 18-1 minimums apply retroactively in § 3582(c)(2) proceedings.  If it did, which as shown above is the fair reading of the Fair Sentencing Act, then Amendment 750 reduced the

---

[2]Justice Sotomayor's concurrence in *Freeman v. United States*, 131 S. Ct. 2685 (2011) is arguably in some tension with such a reading.  Her analysis however is focused specifically on the Rule 11(c)(1)(C) context, and does not necessarily control how § 3582 should be applied to issues involving mandatory minimum sentences in the context of the Fair Sentencing Act.

Blewetts' sentencing ranges and the effect of that reduction is not blocked by operation of a statutory mandatory minimum.

This analysis does not mean that the Sentencing Commission is trumping the statute. The revised statutory minimums are, after all, created by statute. The Sentencing Commission, acting properly under 28 U.S.C. § 994(u), made the Fair Sentencing Act-driven guidelines retroactive. Doing so provided the statutory key to making the statutory minimum changes applicable under § 3582. This is a reasonable statutory interpretation, and it is particularly reasonable to avoid an incoherent anomaly.

It is no answer to this reading to say that the Constitution would somehow be violated if the retroactive application of a statutory provision depends on agency action. The Sentencing Commission may, when statutorily authorized and guided by an intelligible principle, make substantive decisions affecting sentences without violating what is left of the nondelegation doctrine. That is one of the central holdings of *Mistretta v. United States*, 488 U.S. 361, 371–79 (1989). There is no particular reason that this cannot be the case with respect to retroactivity determinations where the substance is determined by Congress.[3] Indeed, our court has rejected out of hand such an argument in the context of the Sex Offender Registration Notification Act (SORNA). In *United States v. Felts*, 674 F.3d 599, 606-07 (6th Cir. 2012), we recognized as legitimate the power of the Attorney General to determine the applicability of the substantive criminal provisions of SORNA to persons who committed, prior to the Act's effective date, offenses for which they had to register.

It is true that the Sentencing Commission was not required to make the 18-1 guideline change retroactive, regardless of how expected such a move was. And if the

---

[3]The *Mistretta* opinion does not hold that the Constitutionality of the Sentencing Commission depends on the premise that Congress did not "vest in the [Commission] the legislative responsibility for establishing minimum and maximum penalties," but rather indicated, in discussing what degree of political authority was inappropriate, that the Guidelines do not "vest in the Judicial Branch the legislative responsibility for establishing minimum and maximum penalties *for every crime*." 488 U.S. at 396 (emphasis added.) Section 3582 does not establish a minimum or maximum penalty in this sense for *any* crime. It instead provides a way in which the court may apply minimums revised by *statute* to crimes sentenced prior to the effective date of the change. *Mistretta*, decided when Guidelines sentencing was mandatory, upheld seemingly much more substantive power by the Commission.

Commission had not made the guideline change retroactive, the anomalies emphasized above would not have occurred. It made sense, therefore, for the retroactivity of the 18-1 ratio to be applied in §3582 only if the Commission made the guidelines changes retroactive. Tying the retroactivity of the revised statutory minimums to the retroactivity of the revised guidelines, which a fair reading of the statutory provisions would do, creates a system that is fair and coherent overall. It gives the Commission the responsibility for making the 18-1 ratio retroactive, works fairness, and avoids anomalies that are an embarrassment to the law. Sticking persistently to the 100-1 ratio for the sole purpose of statutory minimums applied prior to the effective date of the Fair Sentencing Act, while in other respects permitting the 18-1 ratio to be applied retroactively, attributes to Congress the creation of a strange deformed one-winged bird. I would not attribute such an intent to Congress.

I do agree with the majority, however, that the constitutional avoidance principle does not apply in this case. We should not, however, let the weakness of the constitutional argument infect a dispassionate analysis of the meaning of the Fair Sentencing Act. The purpose of the Fair Sentencing Act was to increase fairness in sentencing, and it is entirely incoherent to provide for retroactive fairness in some cases but not in others on a formalistic distinction not compelled by the language of the statute.

—————————

## DISSENT

—————————

HELENE N. WHITE, Circuit Judge, dissenting.  I concur in Judge Rogers's dissent.  I write separately to express the view that the fair implication of the Fair Sentencing Act is that Congress intended that the Sentencing Commission determine whether and to what extent the newly enacted increased base-cocaine quantity thresholds for triggering mandatory minimum sentences would be applicable to defendants already under sentence.  Further, allowing application of the new 18:1 ratio to all offenders already under sentence except those whose sentences under the new ratio would clash with the old 100:1 ratio's mandatory minimum sentences bears no rational relation to any identified Congressional purpose.

### I.

The majority dismisses the argument that Congress intended that the Commission determine to what extent the increased base-cocaine mandatory-minimum threshold should apply to offenders already under sentence, characterizing it as a "theory of springing retroactivity" that "raises serious constitutional doubts" because "[t]he constitutionality of the Sentencing Commission depends on the premise that Congress did not 'vest in the [Commission] the legislative responsibility for establishing minimum and maximum penalties.'"  Majority Op. at 11 (quoting *Mistretta v. United States*, 488 U.S. 361, 396 (1989)).  The majority does not explain why allowing the Commission to determine to what extent a change in penalty *promulgated by Congress* should be applied retroactively to the benefit of offenders already sentenced is an excessive delegation of legislative authority while allowing the Commission to determine the many aspects of sentencing confided to it under the Sentencing Reform Act of 1984 is not.  I question whether had Congress expressly stated that in promulgating the "guidelines, policy statements, or amendments" mandated by Section 8 of the Fair Sentencing Act the Commission should address the extent to which the amended base-cocaine amounts for triggering the mandatory minimums should be applied to resentencing proceedings

under § 3582, the majority would declare the delegation unconstitutional, and on what basis.

The Sentencing Commission, created by Congress under the Sentencing Reform Act of 1984, consists of seven voting members appointed by the President with the advice and consent of the Senate, at least three being Federal judges selected from a list recommended by the Judicial Conference of the United States, and no more than four being of the same political party, all subject to removal by the President only for good cause, with the Attorney General, or his or her designee, serving as an additional ex officio non-voting member. *See* 28 U.S.C. § 991(a). In creating the Commission, Congress recognized the important role each branch of government must play in achieving effective, but fair, sentencing rules and practices. "Historically, federal sentencing—the function of determining the scope and extent of punishment—never has been thought to be assigned by the Constitution to the exclusive jurisdiction of any one of the three Branches of Government." *Mistretta*, 488 U.S. at 364.

The Commission has functions that can be regarded as being within the purview of all three branches of government. As explained in *Mistretta*:

> In addition to the duty the Commission has to promulgate determinative-sentence guidelines, it is under an obligation periodically to "review and revise" the guidelines. [28 U.S.C.] § 994(o). It is to "consult with authorities on, and individual and institutional representatives of, various aspects of the Federal criminal justice system." *Ibid.* It must report to Congress "any amendments of the guidelines." § 994(p). It is to make recommendations to Congress whether the grades or maximum penalties should be modified. § 994(r). It must submit to Congress at least annually an analysis of the operation of the guidelines. § 994(w). It is to issue "general policy statements" regarding their application. § 994(a)(2). And it has the power to "establish general policies . . . as are necessary to carry out the purposes" of the legislation, § 995(a)(1); to "monitor the performance of probation officers" with respect to the guidelines, § 995(a)(9); to "devise and conduct periodic training programs of instruction in sentencing techniques for judicial and probation personnel" and others, § 995(a)(18); and to "perform such other functions as are required to permit Federal courts to meet their responsibilities" as to sentencing, § 995(a)(22).

. . . . Every year, with respect to each of more than 40,000 sentences, the federal courts must forward, and the Commission must review, the presentence report, the guideline worksheets, the tribunal's sentencing statement, and any written plea agreement.

488 U.S. at 369–70.

Congress gave the Commission detailed parameters and constraints and then confided to it the task of promulgating binding[1] guidelines and policy statements effectuating Congress's intent. Within that delegation was the express authority to decide in "what circumstances and by what amount the sentences of prisoners serving terms of imprisonment" should be reduced when the Commission reduces the recommended guidelines term. 28 U.S.C. § 994(u). This authority is unusual in and of itself. The majority repeatedly invokes the paramount interest in the finality of sentences; yet, the scheme set up by Congress contemplates not only that finality is not sacrosanct, but that consideration whether a change should be available for application to offenders already under sentence should be a part of the very process of making changes, and the determination left to the Commission's sound discretion.

The Commission has exercised its authority to make guidelines changes available for retroactive application on several occasions. When it has done so, it has engaged in the thoughtful holistic analysis contemplated by the Congressional delegation of authority. This general approach is set forth in the background comments to U.S.S.G. § 1B1.10:

> Among the factors considered by the Commission in selecting the amendments included in subsection (c) [18 U.S.C. § 3582(c)(2)] were the purpose of the amendment, the magnitude of the change in the guideline range made by the amendment, and the difficulty of applying the amendment retroactively to determine an amended guideline range under subsection (b)(1).
>
> The listing of an amendment in subsection (c) reflects policy determinations by the Commission that a reduced guideline range is

---

[1] Until the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines were binding on the sentencing court, except under narrow circumstances.

sufficient to achieve the purposes of sentencing and that, in the sound discretion of the court, a reduction in the term of imprisonment may be appropriate for previously sentenced, qualified defendants. The authorization of such a discretionary reduction does not otherwise affect the lawfulness of a previously imposed sentence, does not authorize a reduction in any other component of the sentence, and does not entitle a defendant to a reduced term of imprisonment as a matter of right.

The Commission has not included in this policy statement amendments that generally reduce the maximum of the guideline range by less than six months. This criterion is in accord with the legislative history of 28 U.S.C. 994(u) (formerly section 994(t)), which states: "It should be noted that the Committee does not expect that the Commission will recommend adjusting existing sentences under the provision when guidelines are simply refined in a way that might cause isolated instances of existing sentences falling above the old guidelines or when there is only a minor downward adjustment in the guidelines. The Committee does not believe the courts should be burdened with adjustments in these cases." S. Rep. 225, 98th Cong., 1st Sess. 180 (1983).

U.S. Sentencing Guidelines Manual § 1B1.10 cmt. background (footnote omitted).

In the case of the instant amendment, promulgated at Congress's direction pursuant to the Fair Sentencing Act,[2] the Commission carefully considered the purpose of the amendment (to restore fairness in Federal cocaine sentencing), the significant magnitude of the change (12,000 offenders eligible for a 23 percent sentence reduction), and the administrative burden (manageable, considering the comment and testimony received by the Commission regarding resentencing under the retroactive 2007 crack-cocaine amendment, which involved more prisoners than the instant amendment).

---

[2]The majority states:

> All that could justify the Commission's authority to make the new guidelines retroactive is its authority to fill the gap in the Fair Sentencing Act and to construe its own guidelines and policy statements. Let us assume for the sake of argument that the Commission indeed had such authority and thus permissively made the guidelines retroactive to individuals previously sentenced.

Majority Op. at 10. It is unclear to me whether this statement simply reflects the majority's reluctance to accept that the Commission has the power to make guidelines retroactive, or serious doubt whether 28 U.S.C. § 994(u) gives the Commission the authority to make guidelines changes applicable to offenders previously sentenced. In any event, I think the authority is clear.

Sentencing Guidelines for the United States Courts, 76 Fed. Reg. 41332-01, 41333–34 (July 13, 2011). This is exactly what Congress expected of the Commission.

Congress was deliberately silent regarding the retroactivity of the Fair Sentencing Act, not because it was relying on the general savings provision, but because it chose to leave that determination to the Commission. Congress gave the Commission the authority and responsibility to make this decision because it had already created a structure that placed the Commission in the best position to make the retroactive-application determination. In directing the Commission to promulgate the amendments and policy statements necessary to implement the Fair Sentencing Act, Congress included the responsibility to determine whether and to what extent the new provisions would apply to those already under sentence. I do not find in the majority opinion a satisfactory reason for concluding otherwise.

This is not to say that the creation of the Sentencing Commission included a blanket delegation of the authority to determine the effective date of all Congressional amendments concerning sentencing. It is simply an acknowledgment that Congress created a system in which the Commission is charged with making decisions regarding the retroactive application of guidelines changes and in which Congress might leave to the Commission the determination of the proper application of an amendment to offenders who have already been sentenced.

Consistent with this interpretation of the Sentencing Reform Act and the Fair Sentencing Act is that when Congress did not intend that the Commission have the authority to address the retroactive application of a change to the mandatory minimum sentence scheme, it made its intent clear. In the Violent Crime Control and Law Enforcement Act of 1994, Congress amended § 3553 by adding subsection (f) (now known as the "safety valve"), providing an exception to the mandatory minimums of the Controlled Substances Act and the Controlled Substances Import and Export Act for certain offenders. As in Section 8 of the Fair Sentencing Act, Congress directed the Commission to promulgate guidelines or amendments to carry out the purposes of the

amendment.   But Congress additionally did something it did not do in the Fair Sentencing Act; it provided an effective date:

> (c)  EFFECTIVE DATE AND APPLICATION – The amendment made by subsection (a) shall apply to all sentences imposed on or after the 10th day beginning after the date of enactment of this Act.

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, § 80001(c).   The majority explains this away by providing the "simpler explanation" that by default under the savings statute, the new safety valve would not have applied to those who offended before the statute's effective date but were sentenced after, so "Congress *had* to provide that the safety valve 'shall apply to *all* sentences imposed' after the effective date."  Majority Op. at 12.   The majority thus asserts that Congress *had* to use effective-date language in the Violent Crime Control and Law Enforcement Act –which language was omitted from the Fair Sentencing Act–so that the Violent Crime Control and Law Enforcement Act would be understood to have the precisely the same applicability to yet-to-be-sentenced offenders that the Fair Sentencing Act has without effective-date language.   I reject this explanation and find it significant that in making the changes effected by the Fair Sentencing Act, Congress declined to provide an effective date as it had in the Violent Crime Control and Law Enforcement Act, thereby indicating its intent to rely on the Commission's mandate to consider when guidelines amendments should apply retroactively.

One might retort that this turns the general savings statute on its head by requiring a clear implication that Congress did *not* intend retroactive application.  But, as recognized in *Dorsey v. United States*, 132 S. Ct. 2321 (2012), the  Sentencing Reform Act sets forth a background context within which the Fair Sentencing Act must be evaluated.  Had Congress added a reference to § 994(u) of the Sentencing Reform Act (*see* p. 71 *supra*) in its mandate to the Commission, so that section 8 directed the Commission to "promulgate guidelines, policy statements or amendments provided for in this Act as soon as possible *and determine to what extent these guidelines, policy statements and amendments shall apply to prisoners serving terms of imprisonment*," would this constitute fair implication, or would the majority still insist that Congress

intended that the new guidelines, but not the new minimum quantities on which they are based, be available for application to prisoners under sentence at the Commission's discretion? Presumably this would not constitute fair implication in the majority's view because the added language italicized above is implied in any event, given that it is already within the provisions of the Sentencing Reform Act.

It is the majority that turns the Fair Sentencing Act on its head by its rigid adherence to the general savings statute in the face of the Commission's clear authority to establish the new guidelines based on the greater mandatory-minimum thresholds and to decide whether and to what extent the new thresholds should be applied to prisoners under sentence.

The majority finds much significance in the Commission's own statements, observing that the Commission itself has announced that Amendment 750 "only allows the guideline changes to be considered for retroactive application; it does not make any of the statutory changes in the Fair Sentencing Act of 2010 retroactive." Majority Op. at 16. This observation is found in the "Reason for Amendment" section of the Commission's "Notice of final action regarding amendment to Policy Statement 1B1.10" in the Federal Register. 76 Fed. Reg. at 41333. It is part of the Commission's discussion of the first of the three factors considered in determining whether to apply an amendment retroactively—the purpose of the amendment—and comes after the following:

> The purpose of Parts A and C of Amendment 750 was to account for the changes in the statutory penalties made by the Fair Sentencing Act of 2010, Public Law 111-220, 124 Stat. 2372, for offenses involving cocaine base ("crack cocaine"). See USSG App. C, Amend. 750 (Reason for Amendment). *The Fair Sentencing Act of 2010 did not contain a provision making the statutory changes retroactive. The Act directed the Commission to promulgate guideline amendments implementing the Act. The guideline amendments implementing the Act have the effect of reducing the term of imprisonment recommended in the guidelines for certain defendants, and the Commission has a statutory duty to consider whether the resulting guideline amendments should be made available for retroactive application.* See 28 U.S.C. 994(u) ("If the Commission reduces the term of imprisonment recommended in the guidelines * * * it shall specify in what circumstances and by what amount sentences of prisoners * * * may be reduced."). In carrying out its statutory duty to

> consider whether to give Amendment 750 retroactive effect, the Commission also considered the purpose of the underlying statutory changes made by the Act. *Those statutory changes reflect congressional action consistent with the Commission's long-held position that the then-existing statutory penalty structure for crack cocaine "significantly undermines the various congressional objectives set forth in the Sentencing Reform Act and elsewhere"* (see USSG App. C, Amend. 706 (Reason for Amendment)). The Fair Sentencing Act of 2010 specified in its statutory text that its purpose was to "restore fairness to Federal cocaine sentencing" and provide "cocaine sentencing disparity reduction". See 124 Stat. at 2372.

76 Fed. Reg. at 41333 (emphasis added).

This explanation for the amendment states clearly that the Commission determined that the guidelines amendment implementing the Fair Sentencing Act should be available for retroactive application through resentencing under § 3582. The cautionary remark relied on by the majority simply states that the inclusion of the amendments in the policy statement makes the guidelines changes available for retroactive application, but does not make the statutory changes retroactive. The statement is susceptible of more than one interpretation.

The majority reads it as a statement of recognition that the drug quantities triggering the mandatory minimum sentences of the Anti-Drug Abuse Act continue in effect and control the resentencing of offenders who were subject to those mandatory minimum sentences when initially sentenced, unaffected by the new guidelines promulgated and made available for retroactive application by the Commission following enactment of the Fair Sentencing Act. The comment can also be understood, however, as a statement that the only resentencing contemplated by the Fair Sentencing Act is the limited resentencing allowed under § 3582, and that a full resentencing based upon a retroactive change in the law separate and apart from the guidelines change is not authorized. The difference between a § 3582 proceeding and a full resentencing is significant. Only the relevant guidelines amendments are considered in a § 3582 proceeding, whereas in a full resentencing all sentencing factors are considered anew; similarly, *Booker* does not apply in § 3582 proceedings. *Dillon v. United States*,

560 U.S. 817 (2010).  The distinction between a full resentencing and a § 3582 proceeding highlights the difference between *Dorsey* and the instant case as well.  The defendants who received the benefit of *Dorsey* were held to be entitled to the retroactive application of the statute on direct appeal, meaning they were entitled to a full, initial sentencing governed by the provisions of the Fair Sentencing Act.  In contrast, the Blewetts and others like them are eligible for only a limited resentencing under § 3582, wherein only the guidelines amendment is available for application by the court, subject to the policy statement.

The majority also finds it telling that the Commission has urged Congress to make the provisions of the Fair Sentencing Act retroactive.  The Commission has done so in the face of numerous court decisions holding that trial courts have no authority to consider § 3582 motions based on the amended guidelines where the resulting sentence would be constrained by the former mandatory minimum quantity levels.  The Commission's position is simply a reflection of its acceptance of the courts' decisions.

In any event, whatever the intended meaning of the Commission's statement, it is clear that the Commission would allow the new mandatory minimums to have retroactive application to the extent legally permissible.  And, since Congress intended that the Commission decide to what extent the Fair Sentencing Act should be available for retroactive application through § 3582, the applicability of the new minimum levels is clear.

**II.**

I agree with the majority that, assuming Congress intended the general savings provision to preclude application of the new minimum levels to § 3582 resentencing proceedings, no intentional discrimination can be inferred from the failure to make the new minimum levels retroactive.

However, I agree with my colleagues who would sustain a traditional rational-relation challenge.  The majority rejects this challenge:

> The Blewetts, joined by several of the dissents, add that Congress acted "irrationally" by failing to make the Fair Sentencing Act fully retroactive. But the government has a strong interest in the finality of sentences, and the Fair Sentencing Act advances that interest. Ruling otherwise means forgetting *Armour v. City of Indianapolis*, which endorsed "the rationality of the distinction . . . the law often makes between actions previously taken and those yet to come," and forgetting *Dillon v. United States*, which was "aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent . . . amendments."

Majority Op. at 18 (citations omitted).

There is no question that the threshold for establishing irrationality is high and the legislative justification necessary to defeat a rational-relation challenge is correspondingly low. But rationality is nevertheless required. In the normal case, it would seem that almost any line Congress might draw regarding the effective date of legislation would be rational; it would be hard to imagine a line that would lack any conceivable justification. But this is not the normal case because Congress did not draw a line; it allowed for the retroactive application to some offenders but, according to the majority, not others. It is the rare case where rationality is absent.

Had Congress determined that the Fair Sentencing Act's new provisions should be applied only to offenses committed, or sentences imposed, after its passage, such a determination would be rational for the reasons stated by the majority—the government has a strong interest in the finality of sentences and there is no constitutional right to retroactive application of sentencing changes. But Congress did not so determine. Congress directed the Commission to promulgate the guidelines, policy statements, or amendments implementing the Fair Sentencing Act as soon as practicable. Fair Sentencing Act of 2010, Pub. L. 111-220, § 8, 124 Stat. 2372, 2374 (2010). And, although Congress did not direct that those changes be applied retroactively where the mandatory minimum is not involved, it left it to the Commission to decide. Once that door was opened, any interest in the finality of sentences was abandoned. All the considerations that enter into the decision to make the new mandatory minimum levels applicable only to future sentencing proceedings—whatever we may imagine those

reasons to be granting Congress the benefit of all possible explanations—apply equally to the decision whether the new 18-1 ratio should permit resentencing where the mandatory minimum levels are not involved.  Yet, Congress allowed resentencing in the latter circumstance.  We do not know if the 12,000 cases identified by the Commission include cases controlled by the old mandatory minimum levels, but it is inconceivable that the burden of resentencing, or the interest in sentencing finality, is impacted by the difference between applying the Fair Sentencing Act to permit resentencing under § 3582 only where the old mandatory minimum levels are not implicated and applying the Fair Sentencing Act to permit resentencing even where the old mandatory minimum levels are implicated.

Nor, as the majority suggests, does recognition that there is no rational basis to draw this line lead to the conclusion that the Equal Protection Clause has been violated by the denial of individual motions for resentencing for reasons other than that the former mandatory minimum thresholds still control.  Denying the benefits of the Fair Sentencing Act to some offenders already under sentence, but not others, based on their personal characteristics and the specific facts of their offense is neither irrational nor unfair, and no more violates the Equal Protection Clause than imposing different sentences in the first instance.

Further, contrary to the majority's objection, *Dillon*'s observation is not forgotten in this analysis.  The Blewetts's claim does not rest on an asserted constitutional right to the retroactive application of the Fair Sentencing Act.  It rests on the irrationality of allowing its application to all sentences that have become final and are affected by the new guidelines *except* sentences based on the very mandatory minimum levels that the Fair Sentencing Act amended.[3]  Congress did not intend this irrationality, and that is

---

[3]In addition to the irrational results outlined by Judge Rogers, I note the following:

Assuming a Criminal History Category of I and no aggravating factors or other adjustments to the Offense level, the application of the new guidelines without the Fair Sentencing Act's increased mandatory-minimum thresholds will result in the following:

A 60-month sentence is a within-guidelines sentence for crack quantities up to 27 grams, but a 60-month sentence continues to be the mandatory minimum sentence for quantities of 5 grams or more. Assuming all eligible offenders are resentenced to the minimum permissible term, all offenders with

why Judge Rogers is correct. Nevertheless, if Congress is understood to have the intent ascribed to it by the majority, that intent is irrational and violates the Equal Protection Clause absent rational justification other than finality.

---

quantities from 5 grams to 27 grams will have 60-month sentences. Offenders with 4 grams are eligible for sentences as low as 21 months (21-27 month range.)

     Under the new guidelines, a sentence as low as 121 months is a guidelines sentence for quantities up to 839 grams. A 120-month sentence is a within-guidelines sentence for amounts up to 279 grams. The new guidelines range for quantities from 28 grams to 111 grams is 63-78 months, but possession of 50 grams or more dictates a 120-month mandatory minimum under the old minimum levels. Thus, after resentencing, offenders with quantities from 50 grams through 111 grams will be serving 120-month sentences; offenders with up to 279 grams will also be eligible for 120-month sentences; offenders with up to 840 grams will be eligible for 121-month sentences; and offenders with 49 grams will be eligible for as little as 63 months.